### CHARLES A. EBERT v. MUTUAL RESERVE FUND LIFE ASSOCIATION.[1]

August 3, 1900.

Nos. 12,154, 12,248—(236,[2] 110[3]).

### Life Insurance—Assessment Plan.

Defendant was a corporation organized under the laws of New York for the purpose of conducting life insurance upon the co-operative or assessment plan. *Held*:

### Policy of Insurance a Contract.

1. One who takes out a policy therein enters into a contract which includes and is construed with reference to the policy, application, constitution, by-laws, and enabling act.

### Change of Rate of Assessment.

2. The board of directors of such association have authority to change the rates of assessment from time to time to meet the death losses and expenses, provided the apportionment is equitable.

[1] Reported in 83 N. W. 506, 84 N. W. 457.
[2] April, 1900, term.                    [3] October, 1900, term.

### Classification of Policyholders—Different Rates.

3. In the absence of such authority by the contract, the directors cannot arbitrarily place all members who joined prior to a certain year into a class by themselves, and advance their ages each year as assessments are made, while all members joining after that date are assessed as of the age of entry.

### Same—Equity.

4. Such discrimination against the old and in favor of the new members is not an equitable distribution of the increasing cost of carrying the older members, and was not contemplated by the terms of their contracts.

### Cancellation of Policy—Damages.

5. In case of the unlawful cancellation of a member's policy for refusal to pay such illegal assessments, the measure of damages is not the amount of the premiums paid by the member, but the damage resulting at the date of cancellation, allowance having been made for insurance already had. As to the proper method of estimating such damages, quære.

Action in the district court for Hennepin county to recover $1,999 damages for the unauthorized cancellation of a life insurance policy. The case was tried before Elliott, J., who found in favor of defendant. From a judgment entered pursuant to the findings, plaintiff appealed. Reversed.

*Hale & Montgomery*, for appellant.

*Cobb & Wheelwright, George Burnham, Jr.*, and *S. T. Tyng*, for respondent.

LEWIS, J.

Defendant company was incorporated under the laws of the state of New York for the purpose of transacting the business of life insurance upon the assessment or co-operative plan. In September, 1885, plaintiff signed an application and took out a policy for $3,000, he then being fifty-eight years of age. Upon the back of this policy was a table of rates, as follows:

TABLE OF RATES.

Admission Fee:—$1,000—$8; $2,000—$12; $3,000—$15; $5,000—$20; $10,000—$30.

Dues.

The dues for expenses are $2 on each $1,000, payable annually in advance.

Assessment Rate Table.

No assessments will be made while there remains in the death fund a sum sufficient to pay the existing claims in full.

The basis of the assessment rate for each member according to the age taken at the nearest birthday, on each $1,000, is as follows:

| Age. | Rate. | Age. | Rate. | Age. | Rate. |
|---|---|---|---|---|---|
| 15 to 25 | $1 00 | 39 | $1 40 | 53 | $2 75 |
| 26 | 1 02 | 40 | 1 44 | 54 | 3 00 |
| 27 | 1 04 | 41 | 1 48 | 55 | 3 25 |
| 28 | 1 06 | 42 | 1 52 | 56 | 3 50 |
| 29 | 1 08 | 43 | 1 56 | 57 | 3 75 |
| 30 | 1 10 | 44 | 1 60 | 58 | 4 00 |
| 31 | 1 12 | 45 | 1 64 | 59 | 4 25 |
| 32 | 1 14 | 46 | 1 68 | 60 | 4 50 |
| 33 | 1 16 | 47 | 1 72 | 61 | 5 00 |
| 34 | 1 20 | 48 | 1 76 | 62 | 5 50 |
| 35 | 1 24 | 49 | 1 80 | 63 | 6 00 |
| 36 | 1 28 | 50 | 2 00 | 64 | 6 50 |
| 37 | 1 32 | 51 | 2 25 | 65 | 7 00 |
| 38 | 1 36 | 52 | 2 50 | | |

Plaintiff was assessed according to the rate fixed by this table as of the age of entry, fifty-eight years, until February, 1889, when a new table of rates was adopted, in which the maximum rates were increased, and the rate opposite the age of fifty-eight years was made $6.03 bimonthly, and annually $18.36, for each $1,000. Plaintiff was assessed according to this table at the age of fifty-eight, $18.09 bimonthly, until 1895, when call No. 81 was made on the basis of the age of sixty-three years, amounting to $27.33 bimonthly, although plaintiff was at that time sixty-eight years old. Plaintiff paid under protest this assessment and others, up to call No. 86 which was made February 1, 1898, when the age of assessment was again advanced, and made upon the then current age, which, according to the plaintiff's then age, seventy years, amounted to $46.50 bimonthly. This assessment plaintiff refused to pay, and

he tendered defendants the amount of the assessment as upon the age fifty-eight years, according to the table which went into effect in 1889. The tender was refused, and defendant cancelled the policy for nonpayment; and plaintiff brought this action to recover all the assessments he had paid, with interest. Judgment was ordered for the defendant, and plaintiff appeals.

This action is based upon the theory that the original contract was that plaintiff should pay future assessments upon the age of entry, fifty-eight years, and that the subsequent change of that age in 1895 to sixty-three years, and in 1898 to seventy years, was in violation of the contract, and the cancellation of plaintiff's policy a fraud upon the rights, and that the measure of damages is the amount he has paid.

Defendant rests upon the proposition that the contract as to assessments was not absolute or fixed as of the age of entry, but that the application and policy must be construed in connection with the constitution and by-laws of the company. Defendant admits that the by-laws then in force did not contain authority to assess upon the basis of the rate table in force at the age of entry, fifty-eight years, but holds that the contract of insurance between itself and plaintiff contemplated and included the following considerations: That the nature of the insurance taken out was of the assessment or co-operative character which implied mutual obligations among the members each to stand an equitable assessment according to the cost; that the amount of the assessments must necessarily vary from year to year according to changing circumstances, viz., the number of deaths, and the amount of business written; that for these reasons it would become necessary from time to time to change the rate to conform to the new conditions; that the constitution provided that amendments should be made in its rules and regulations to meet such contingencies; that the board of directors had, by the constitution, general authority to adopt rules adapted to a determination of the amount of benefits for which certificates of membership should issue, rates of assessments, admission fees, and annual dues, and to adopt such other rules and regulations as they may deem best for the interests of the association; that all of these matters were necessarily con-

templated by plaintiff when he became a member; that he contracted with reference to and in anticipation of such conditions and contingencies, and, the increased rates being necessary and equitable, plaintiff could not complain.

To this argument appellant replies that, if all that respondent claims as to the nature of the contract be conceded, yet the change in the rate of assessment as to all members who entered prior to 1890 was arbitrary, inequitable, and not within the most liberal construction possible of defendant's powers. We are, therefore, necessarily first required to determine what the contract of insurance was.

The application for the policy contained a provision that no statement or representation or information made or given by or to the person soliciting or taking the application should be binding upon defendant unless the same be reduced to writing and presented to the officers at the home office at New York. Plaintiff made an inquiry of the local agent at Minneapolis, at the time he made the application, as to whether the age stated in the policy rate table referred to the age of entry, or the current age as each assessment was levied, and was told by him that it was the age of entry. This information on the part of the local agent was merely voluntary, and, under the conditions of the policy, not binding upon defendant. The contract must be construed according to the terms of the application, the policy, constitution, and by-laws then in force, as well as the New York statute under which the company was incorporated. As before stated, the table of rates then in force was upon the back of the policy. In connection with that table it was stated that no assessment should be made while there remained in the death fund a sum sufficient to pay the existing claims in full, and that the basis of the assessment rate for each member according to age taken at the nearest birthday, on each $1,000, was according to that table. In the body of the policy it was stated that, in case of the death of the insured, there should be paid to the proper representative $3,-000 from the death fund at the time of death, or from any moneys that should be realized to said fund from the next assessment to be made as thereinafter set forth. It was then provided as follows:

"If, at such date as the board of directors of the association may from time to time fix or determine for making an assessment, the death fund is insufficient to meet existing claims by death, an assessment shall then be made upon every member whose certificate is in force at the date of the last death assessed for, and said assessment shall be made at such rates, according to the age of each member, as may be established by the said board of directors; and the net amount received from such assessment, less 25 per cent. to be set apart for the reserve fund, as provided in the constitution and by-laws of said association, shall go into the death fund."

Then follows a clause as to a reserve fund of twenty-five per cent. of the net receipts of all assessments, to be deposited with a trust company, to be invested in interest-bearing securities, for the exclusive benefit of the association, to be placed to the credit of the death fund, to be used in providing for current death claims, and that this reserve fund in excess of $100,000 and the outstanding bonds might be applied to the payment of claims in excess of the American Experience Table of Mortality. Then follows a provision for the issuance of bonds, at the expiration of every period of five years, to the several members, for an equitable interest of this reserve fund, the principal of which should be available, ten years from its date, toward paying future dues and assessments.

It is evident that the contract contemplated an unsteady and varying death fund from which to pay death claims and that the amount of the assessments would vary according to the number of deaths, the growth of the association in membership, and earning capacity of the reserve fund. It is also clear that the law of self-preservation applied, and if, at any time, in order to meet maturing claims, it should become necessary to levy a larger amount than that stipulated as the maximum rate of the table, the power so to do was inherent in the association, and the directors would have authority to pass suitable rules and regulations for that purpose. But it is equally clear that neither by the contract of insurance, in contemplation of the laws of New York, the constitution and by-laws, nor from the natural, inherent power of the association, based upon the doctrine of the general good, does there exist authority to arbitrarily determine in favor of one class of members and against another class.

It will now be advisable to note the changes made by the company, claimed to have a bearing on the rights of the parties under the contract:

The company commenced business in 1881, and by January, 1889, had paid all its claims and accumulated a reserve fund of $1,885,000. At the annual meeting held on January 23, 1889, the so-called Shields resolution was passed, providing that, in view of the rapidly increasing reserve fund, in the event any sums might thereafter be required for the payment of death claims in excess of the sums realized from mortuary calls at the maximum rates at the age of entry, as established by the association, that are applicable to the death fund, the board of directors should have the power to pay such death claims in excess thereof from the current receipts that are applicable to the surplus reserve emergency fund, providing that said surplus should always be maintained at a sum not less than $2,000,000. The effect of this resolution was to make available at once a part of the rapidly accumulating reserve fund, which would to that extent reduce the amount of the assessments. The resolution was not directed to any particular class of members, and was, no doubt, within the powers of the association, and not contrary to the terms of plaintiff's contract, and we fail to see what effect it has upon the questions involved here. It next appears that on February 28, 1889, the board of directors adopted the second table of rates, which was as follows:

TABLE OF MAXIMUM MORTUARY PREMIUMS FOR EACH $1,000 OF
INSURANCE, INCLUDING RESERVE OR
EMERGENCY FUND.

| Age. | Average Amt. Which May be Collected Every Two Months. | Average Amt. Which May be Collected Annually. | Age. | Average Amt. Which May be Collected Every Two Months. | Average Amt. Which May be Collected Annually. |
|---|---|---|---|---|---|
| 25 | $ 1 80 | $ 10 80 | 53 | $ 4 16 | $ 24 96 |
| 26 | 1 81 | 10 86 | 54 | 4 53 | 27 18 |
| 27 | 1 82 | 10 92 | 55 | 4 91 | 29 46 |
| 28 | 1 84 | 11 04 | 56 | 5 28 | 31 68 |
| 29 | 1 86 | 11 16 | 57 | 5 66 | 33 96 |
| 30 | 1 87 | 11 22 | 58 | 6 03 | 36 18 |
| 31 | 1 89 | 11 34 | 59 | 6 41 | 38 46 |
| 32 | 1 91 | 11 46 | 60 | 6 78 | 40 68 |
| 33 | 1 94 | 11 64 | 61 | 7 53 | 45 18 |
| 34 | 1 96 | 11 76 | 62 | 8 28 | 49 68 |
| 35 | 1 99 | 11 94 | 63 | 9 03 | 54 18 |
| 36 | 2 02 | 12 12 | 64 | 9 78 | 58 68 |
| 37 | 2 05 | 12 30 | 65 | 10 53 | 63 18 |
| 38 | 2 09 | 12 54 | 66 | 11 28 | 67 68 |
| 39 | 2 13 | 12 78 | 67 | 12 03 | 72 18 |
| 40 | 2 20 | 13 20 | 68 | 13 00 | 78 00 |
| 41 | 2 25 | 13 50 | 69 | 14 19 | 85 14 |
| 42 | 2 31 | 13 86 | 70 | 15 50 | 93 00 |
| 43 | 2 37 | 14 22 | 71 | 16 92 | 101 52 |
| 44 | 2 43 | 14 58 | 72 | 18 47 | 110 82 |
| 45 | 2 49 | 14 94 | 73 | 20 04 | 120 24 |
| 46 | 2 57 | 15 42 | 74 | 21 76 | 130 56 |
| 47 | 2 67 | 16 02 | 75 | 23 59 | 141 54 |
| 48 | 2 78 | 16 68 | 76 | 25 55 | 153 30 |
| 49 | 2 91 | 17 46 | 77 | 27 77 | 166 59 |
| 50 | 3 06 | 18 36 | 78 | 30 21 | 181 25 |
| 51 | 3 41 | 20 46 | 79 | 32 94 | 197 60 |
| 52 | 3 78 | 22 68 | 80 | 36 12 | 216 71 |

The maximum or largest amount above stated is based upon the mortality tables and the experience of the association, and is for current ages.

The board at that meeting provided a form for the next (No. 43) mortuary call, in which was contained this new table of rates, and the notice at the bottom. This form of call and notice was used

thereafter, and plaintiff received the same, and was charged with knowledge of its contents. As already stated, plaintiff paid the calls according to this table as of the age of entry, fifty-eight years, until June 12, 1895, when the board of directors passed the following resolution:

"Be it resolved, that the rates of assessment for all members of this association admitted prior to January 1, 1890, be, and the same hereby are, reapportioned, in accordance with the table of assessment rates now in use, to rates indicated by adding to the age of entry one-half the number of years from January 1, of the year of admission to January 1, 1895,—fractions of years resulting from the division to be counted as full years,—and that said reapportioned rates of assessment, together with the present rates of assessments for all members admitted since December 31, 1889, constitute the rates of assessments of this association, beginning with call No. 81, until otherwise ordered by this board: provided, however, that any increase beyond the rate indicated for more than seventy years may, at the member's option, be debited to his policy, and deducted from the amount payable thereunder, instead of being paid in cash."

In pursuance of this resolution, call No. 81 was sent to plaintiff. According to this adjustment, plaintiff was promoted to his due share of honors under the current rate system, and, by adding the five years, he was now to receive the benefits as of the age of sixty-three. But he paid under protest this and subsequent assessments until call No. 96 was made, February 1, 1898. The directors now, having learned how to unload the increasing responsibility of carrying the old members, went at it again; and this time, having the courage of their convictions, and having gradually prepared the old veterans for the inevitable, passed the following resolution:

"Be it resolved, that pursuant to the terms of the contracts with the members, and in virtue of the power reserved to the association, for call No. 96, to issue and become payable February 1, 1898, and for all subsequent calls, until otherwise ordered by the board of directors, the rate of assessment for each member of this association holding a policy or policies upon the fifteen-year plan shall be determined from the table of assessment rates now in use, and under which said policies have hitherto been assessed, and upon the basis of the completed age in years of each member, respectively, and of the amount of insurance by him carried at the date of each call."

The effect of this resolution was to place the old members on the "current basis," by which it meant that all members who took out policies prior to January 1, 1890, should pay according to their ac-, tual age as each assessment was made. For instance, in the case of plaintiff, he must pay, by call No. 81, the amount opposite his then age (seventy years), $15.50 on each $1,000 bimonthly, or $279 annually on his $3,000 policy, and so on every year, until at the age of eighty he would pay $36.12 on each $1,000 bimonthly, or a total of $650.16 for the year. Of course, the result would tend to drive the old members out of the association, and, if that was the purpose, no doubt it has been accomplished.

An attempt is made to justify the action of the directors upon the ground that the old members were originally taken in at the age of entry, and in order to properly adjust their burden with relation to members subsequent to January 1, 1890, the old members should be advanced to the current rates, because that would be their equitable proportion of the current cost of the insurance. The actuary's report and the resolutions mentioned constantly refer to the members who entered prior to January 1, 1890, as "members of the fifteen-year class," as though there was something special about the contracts of those members which would authorize such discrimination. But we find nothing whatever to justify any such classification except the mere fact that the policies provided that bonds might issue every five years for an equitable interest in the reserve fund, as already stated. That fact may serve to distinguish them from subsequent members, but the record does not enlighten us upon that point. Treating the so-called fifteen-year members as a class, it was figured out that they were not paying their equitable portion of the cost of insurance, and so they were advanced as to age. The explanation does not explain. It simply amounts to a confession that the cost of carrying the insurance of the so-called class has been estimated by cutting them off from the association as invigorated by the new members.

Such a proceeding was in violation of the contract. The old members joined the association upon the theory that it was to be a living institution,—as old members drop out and are paid off, new ones come in, younger in years; thus adding strength and

keeping up the vitality of the association. The new members enter upon the same basis and with the same expectation, yet they continue to be assessed as of the age of entry on the 1889 table. There has been shown no reason for drawing an arbitrary line as of January 1, 1890. If the board of directors could advance the age of all members who joined prior to 1890, they can keep on setting out classes according to some certain year of entry, and advance its members, also, as to age. And, if the board can advance the members who joined prior to 1890 to the current rates of the 1889 table, they can for the same reason advance them to years ahead of the current age. The board of directors had no authority to levy such an assessment as call No. 96, and the act of the defendant in cancelling plaintiff's policy for nonpayment of the call made upon such basis was void.

Many authorities have been cited by respondent, claimed to be in defense of its position. They may be divided into two classes: First. Those cases dealing with fraternal benefit societies, where the assessment for the sick fund was in dispute, as Poultney v. Bachman, 31 Hun, 49; Stohr v. San Francisco, 82 Cal. 557, 22 Pac. 1125; Fullenwider v. Supreme Council, 73 Ill. App. 321. In all of that class of cases it has been held that the amount of the benefit could be decreased at any time, and no member had a vested right to receive the sum stipulated when he joined, if the general good of the order required that the amount be reduced. But in those cases no such point is presented as in the case under consideration. In those cases the burden fell equally upon all, and the reasons advanced in support of the rule that the amount of the benefit could be changed as the association directed have no application here. This is not a fraternal benefit association, in that sense. And, besides, the rule which respondent invokes has been wrongly applied in dealing with the old members. The second class of cases are those where the injured party had applied to the courts for equitable relief, and the courts took the position that they had no jurisdiction. It is not necessary to refer to them at this time. In the case of Strauss v. Mutual, 126 N. C. 971, 36 S. E. 352, the North Carolina supreme court took substantially the same view of the

questions involved as we have taken, except upon the question of damages.

We now come to the question of damages. The complaint was drawn, the issue made, and the case tried upon the theory that the measure of damages for the unauthorized act of defendant in cancelling the policy was the amount of the assessments paid by plaintiff, alleged to be about $1,600, and interest. Respondent claims that no damages can be assessed against it in this case, in any event, for two reasons: First, because it is an assessment company, and has no fund to meet such a demand; and second, because the plaintiff has had the benefit of the insurance during the life of the policy, and, if any damages can be recovered at all, the proper measure would be the value of the policy at the date of cancellation, and that, no proof having been taken bearing upon that feature of the case, the judgment must be affirmed.

As to the first point, we do not think it tenable. It has been held that purely fraternal benefit associations are not liable in damages for the unlawful cancellation of a membership, because such corporations act merely as a trustee to collect and distribute a sick or death fund, and have no other fund, and no power to collect any money except to meet such a payment. Lavalle v. Société, 17 R. I. 680, 24 Atl. 467. But defendant corporation is more than a fraternal benefit association. It has a great reserve, accumulates property, and has powers far beyond that class of organizations. It must be that such companies are liable for their unauthorized acts, and, if no other remedy is available, then compensation should be returned in damages. The power to assess its members to meet such obligations is implied, if not directly granted.

Respondent suggests that appellant's remedy is in equity, by applying for an injunction restraining defendant from cancelling the policy, or for a writ of mandamus to compel his restoration to membership. But it is questionable whether plaintiff could acquire jurisdiction for such purposes. In Clark v. Mutual, 14 App. D. C. 154, it was held that the court had no jurisdiction in such an action, for the reason that it would lead to the control, revision, and direction of the internal affairs of the company, whose home office was in New York. If it be true that the courts of this state have no juris-

diction to look into the internal affairs of the defendant, determine what plaintiff's rights are, and enforce his reinstatement upon a proper basis, that fact would seem to be a good reason for awarding damages, it being the only relief possible.

But upon the other proposition we think respondent is correct. Plaintiff can only recover such damages as naturally result from the act complained of. He had the benefit of several years' insurance, and that was a consideration for the money he paid. If death had occurred during that period, the beneficiary of the policy could have enforced payment. There are decisions to the effect that the measure of damages in such a case is the amount of the premiums paid, but the weight of authority is against that proposition. The sounder rule is that the damages are to be measured by the position the parties occupied at the time of cancellation. If at that time plaintiff's health had become impaired to such an extent as made it impossible to secure other insurance, the extent of his damages would be different than if new insurance could be had. If he could at that time have taken out other insurance in a similar company, the measure of damages would be the difference between the cost of such new insurance for the term of his natural life, according to the mortuary tables, and the cost of carrying the cancelled policy for such term, according to the rates established by the 1889 tables, as of the age of entry. But if his health had become impaired, and new insurance could not have been procured, then the measure of damages would seem to be the present value of such a policy as of the date of death, according to the mortuary tables, less the estimated cost of carrying the same from the date of cancellation at his then age. The rates, as of the age of entry, as fixed by the 1889 tables, would be prima facie the cost of such insurance, and the burden would be upon defendant to show it otherwise.

Of course, the views here expressed as to the correct method of estimating the damages are merely tentative. The question is abstruse, and this feature of the case was not argued. We shall feel at liberty to treat the question de novo if it is again presented. But owing to the fact that the trial court disposed of the case upon the ground that the cancellation of the policy was rightfully made, and did not consider the question of damages at all, we are of the

opinion that plaintiff should not be foreclosed from the privilege of again presenting the case upon a different basis as to the proper relief.

Judgment reversed, and a new trial granted.

On October 5, 1900, the following order was made:

PER CURIAM.

Application for a reargument having been made by respondent based upon the claim that the court misunderstood the facts upon which the decision rests, after due consideration, in view of the importance of the question involved, and to guard against a possible mistake, it is ordered that a reargument be had upon the following questions only:

1. Does it appear from the evidence that the passage of the resolution of date February 1, 1898, under which call No. 96 was made, had the effect of discriminating against appellant, as stated in the opinion?

2. Did the trial court find as a question of fact that there was no such discrimination?

3. If the court did so find, is such finding supported by the evidence?

It is ordered, further, that counsel for respondent serve their brief upon counsel for appellant within fifteen days from the date of this order, and that appellant serve his answer thereto within fifteen days thereafter; whereupon the case will be submitted upon such briefs, without oral argument.

On December 6, 1900, the following opinion was rendered:

PER CURIAM.

A reargument having been granted in this case, and having been submitted and duly considered, the conclusion reached in the former opinion is adhered to.