CASTAGNINO et al. v. MUTUAL RESERVE FUND LIFE ASS'N et al.

(Circuit Court of Appeals, Sixth Circuit.    November 20, 1907.)

No. 1,678.

INSURANCE—SUIT FOR CONSTRUCTION OF LIFE POLICY—JURISDICTION TO GRANT RELIEF AGAINST FOREIGN COMPANY.

Where a life insurance company incorporated under the laws of one state has subjected itself to suit in another state in which it does business, has agreed in accordance with its laws that service of process may be made upon the insurance commissioner of such state, and has issued policies to its citizens, such a policy holder has the right to maintain a suit against it in his own state in either the state or federal courts for a construction of his policy and a determination of his rights thereunder and the legality of acts of the company as bearing thereon, and such right may not be denied on the ground that such a suit is an interference with the internal management of a foreign corporation.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 28, Insurance, § 33.]

Appeal from the Circuit Court of the United States for the Western District of Tennessee.

The bill was filed against the Mutual Reserve Fund Life Association and its successor, the Mutual Reserve Life Insurance Company, to interpret and enforce a contract in the form of a policy or certificate of insurance issued by the defendant corporations for $5,000 on the life of Emanuel Castagnino, in favor of the other plaintiff, his wife. The Mutual Reserve Fund Life Association was incorporated under the laws of New York, February 9, 1881, and reincorporated December 23, 1883. It accepted the provisions of the insurance laws of New York of 1892, and received an amended charter February 25, 1902; its name being then changed to the Mutual Reserve Life Insurance Company. The present policy was issued August 31, 1888, when the plaintiff Castagnino was 43 years old, and after the Mutual Reserve Fund Life Association had accepted the provisions of the law of Tennessee authorizing the service of process on the insurance commissioner of that state. It was issued, as usual in such cases, in consideration of the application and its statements, and the payment of the admission fee, of the annual dues for expenses, and all mortuary premiums, payable at the home office in New York City, within 30 days from the first week day of February, April, June, August, October, and December, of every year during the continuance of the policy, and subject to all the provisions, requirements, and benefits stated in the policy, which were made a part of the contract, and are set out in an exhibit to the bill. The plaintiffs claim that the dues for expenses were fixed at the sum of $15 for each year, and that the defendants, before the delivery of the policy, established the amounts to be paid for the mortuary premium every two months during its existence, and that the plaintiffs have paid such amounts for the expenses and for mortuary premiums during the existence of the policy and up to the present time.

The policy contains certain provisions respecting the reserve or emergency fund, the organization of the so-called mortuary department of the association, and the contract between the association and the Central Trust Company of New York, and states that the policy contains a certificate that the association had deposited with such trust company, as a reserve or emergency fund, on March 31, 1888, the amount of $1,463,283.38, of which $1,024,500 was in bonds, and $86,672.78 in cash. According to the policy 25 per cent. of the net receipts of the mortuary premiums during a period of 15 years from the date of the policy was to be added to the reserve or emergency fund, which should be properly invested and the interest placed to the credit of the death fund. It was further provided that the reserve fund above $100,000 should be applied to the payment of claims in excess of the actuaries' table of mortality, and to make up any deficiency that might exist in the death fund, when any claim by death was due after the mortuary premium call. The policy

further provided that the annual mortuary premiums after the policy had been in force 15 years from date should not include any further contribution to the reserve or emergency fund, nor should the net amount of such annual mortuary premium thereafter exceed the annual premiums required by the actuaries' table of mortality, or the actual mortality experience of the association. At the expiration of said 15 years, there should be credited to the policy the equitable proportion of the total surplus or reserve fund accumulation, and also the equitable share of such reserve or emergency fund accumulation contributed by members whose policies had terminated. The amount thus accumulated to the credit of the reserve or emergency fund might be distributed at the option of the policy holders, either as a tontine accumulation payable in cash, or be used as cash toward the payment of future dues and mortuary premiums.

When the policy was delivered, the association had a local manager and agent in Tennessee. He was afterwards withdrawn, and the plaintiff was compelled to pay his annual dues and mortuary premiums or assessments upon the policy at the home office in New York City. When the policy was delivered, the plaintiff paid an admission fee of $20, and the annual dues for expenses of $15, and was informed and believed that a certain sum was fixed by the policy for the mortuary premiums to be paid every two months during the existence of the policy. The policy fixed the mortuary premium at $12.90, payable in each of the six months named, or $77.40 a year. The plaintiff paid these premiums at that rate until 1889, when they were increased to $13.35. They remained at that sum during the years 1889, 1890, 1891, 1892, 1893, and 1894, and up to the month of August, 1895. At that time the executive committee of the association, under the pretext that policies of this class were not paying for the insurance provided, unlawfully and arbitrarily increased the mortuary premiums from $13.35 to $15.05, every two months, or $106.30 per annum, and collected the premiums at that rate during the rest of the year 1895 and the years 1896 and 1897, up to March, 1898. Beginning with March, 1898, the premiums were increased from $17.05 to $26.40 (or $158.40 per annum), for the years 1898 and 1899, up to December. In that month the mortuary call was increased to $30.15 (or $180.90 per annum). This lasted until February, 1900, when the premium was increased to $32.05 (or $192.30 per annum). In April, 1901, the premium was increased to $33.90, at which amount it continued up to and including the month of February, 1902. During this time the defendant made three special assessments, each for $33.90, one in July, one in September, and one in December, 1901, so that the total mortuary premiums for 1901 amounted to $305.10. Beginning with the month of February, 1902, the association increased the mortuary premiums to $37.65, and this rate lasted up to February, 1903. Beginning with that month, the mortuary premium was increased to $41.40 (or $248.40 per annum), which rate was maintained up to the month of February, 1904. Beginning with April, 1904, the premium was increased to $45.15. This rate lasted until March 1905. During this time, three special assessments, each for $45.15, were made, one on September 1, 1904, one on November 1, 1904, and one on February 1, 1905. The amount paid during the year of special assessments, including the latter, was $406.35. Beginning with March, 1905, the mortuary premium was increased to $48.90, which continued up to and including March, 1906. During this time, two special assessments, each for $48.90, were made, one on March 3, 1905, and one on July 1, 1905. During this last year, the mortuary premiums and special assessments amounted to $391.20. On April 2, 1906, the mortuary premium was raised to $52.65. This was paid. On June 1, 1906, a call was made for $52.65, which was not paid to the company owing to this suit, in which the plaintiff prayed that a receiver be appointed and any future calls collected may be held to await the result of the litigation.

The plaintiff insists that these mortuary calls and special assessments were not made in accordance with the provisions of the policy or constitution and by-laws of the association, or of the laws of New York governing that corporation, but arbitrarily and unlawfully made; that they were extortionate and were paid under protest, because of duress, the plaintiff believing the policy would be forfeited if the premiums and assessments were not promptly paid.

After the policy had been in force more than 12 years, namely, on June 15,

1901, the plaintiff was notified by the association that a call had been made by order of the board of directors and the executive committee for the amount of the reserve to the date of the amendment to the by-laws, determined by the actuaries' table of mortality, with interest at 4 per cent. per annum, and that there was due upon the policy under this call $1,362.80, payable within 30 days from date, which amount, if plaintiff so desired, would be loaned him for the purpose of making payments, upon the security of such insurance. That notice stated that the cause of the call was that it had been determined by the actuaries of the association that the net contributions to the death fund made by the members of the class to which the policy of the plaintiff belonged had been less than the tabular mortality by the actuaries' table of mortality, and less than the rate of mortality experienced, and therefore the assessment was levied for the purpose of providing the reserves which would be required under the contract of insurance. Plaintiff claimed that this call and notice were wholly unauthorized and void; that the plaintiff had paid all he was liable for, and could not be held liable for any sum or assessment on account of any deficiency which was assumed to exist or in fact existed at the date of the assessment, and, as a matter of fact, no such deficiency existed in the reserve fund or in the death fund at that date.

Plaintiff insists that under the policy no annual mortuary premiums after August 31, 1903, being 15 years from the date of the policy, could lawfully include any further contributions to the reserve or emergency fund mentioned in the policy, nor could the net amount of any annual premium be charged after that date against the plaintiff in excess of the annual premiums required by the actuaries' tables of mortality and the actual mortality experienced by the association. For this reason, the plaintiffs say that all the assessments and mortuary premiums since August 31, 1903, are excessive and illegal.

At the end of five years after the issuance of the policy, the plaintiffs were entitled every five years to a bond to be issued on their policy; but this provision has never been complied with, but wholly disregarded. The defendant claims that it had been released by the Legislature of New York from compliance with the terms of the charter, but plaintiff insists that no Legislature has attempted to do this.

The prayer asks: That the defendant be enjoined from making any further calls for mortuary premiums and special assessments, or declaring null and void the policy for nonpayment of mortuary premiums or assessments, or on any other ground, until the further order of the court. That a receiver be appointed to receive and hold, subject to the order of the court, such sums as are or may become due upon the policy pending the suit. That the court construe the policy and determine and fix the rights and interests of the plaintiffs, and the obligations and duties of the defendants, and enforce the same by proper orders and decrees. That an account be taken and stated by and between the plaintiffs and the defendant, and it may be determined in what sum the defendant is indebted to the plaintiffs, and that plaintiffs may have a decree against the defendant for the amount due. That it may be decreed that the defendant had no right to make special or extraordinary assessments, or any assessment above the sum of $13.35, fixed in the policy. That the sums collected by mortuary calls or special assessments, in excess of the annual dues and mortuary premiums collected, may be ascertained, and the plaintiffs have a decree against the defendant for the same. That it may be decreed that the defendant had no right on or after August 31, 1903, to include any further contributions to the reserve or emergency fund. That all sums collected after August 31, 1903, on account of mortuary premiums or special assessments, may be found and decreed to be owing and due from the defendants. That the equitable proportion due the plaintiffs on August 31, 1903, at the end of 15 years from the date of the policy, be ascertained, and a proper decree of the same made. That the special assessment made June 1, 1901, for the sum of $1,368.80, under which this charge was made a lien upon the policy, be declared to have been done illegally and without authority, and that the charge and assessment be canceled and held for naught. That the mortuary calls of June 1, 1906, and the succeeding monthly calls after such date, be held to be without authority and illegal.

If the relief specifically prayed for be not granted, and the policy is to be

interpreted as contended by the association, the plaintiffs pray that the court may find and decree that the plaintiffs were induced by fraud to accept the policy and to submit to the demands and exactions of the defendants, and for these reasons the policy be held void, and that the court decree that the sums be repaid to the plaintiff with interest.

A copy of the constitution and by-laws of the association, and also of the various laws of New York governing it, do not appear in the bill; but it is averred that the defendant has them in its possession and can produce them if required or if necessary.

The defendant demurred to the bill on 10 grounds. The demurrer was sustained evidently upon the ground that the court could not grant the prayer of the bill without interfering with the internal management, administration, and control of a foreign corporation, and therefore had no jurisdiction in the premises. In a brief opinion the court cited and followed the following cases: Taylor v. Mutual Reserve, 97 Va. 60, 33 S. E. 385, 45 L. R. A. 621; Howard v. Mutual Reserve, 125 N. C. 49, 34 S. E. 199, 45 L. R. A. 853; Condon v. Mutual Reserve, 89 Md. 99, 42 Atl. 944, 44 L. R. A. 149, 73 Am. St. Rep. 169; Clark v Mutual Reserve, 14 App. D. C. 154, 43 L. R. A. 390; Gaines v. Sup. Council Royal Arc. (C. C.) 140 Fed. 978; Gault v. Mutual Reserve (C. C.) 121 Fed. 403.

Wm. M. Randolph, George Randolph, and Wassell Randolph, for appellants.

T. B. Turley, E. R. Turley, and John D. Martin, for appellees.

Before LURTON, SEVERENS, and RICHARDS, Circuit Judges.

RICHARDS, Circuit Judge (after stating the facts as above). If the cases cited by the court below were decided rightly, the demurrer was properly sustained, and the judgment should be affirmed. The present case therefore turns upon the strength of the rule promulgated in those cases. The leading ones, the Clark, from the District of Columbia, the Condon from Maryland, the Taylor from Virginia, and the Howard from North Carolina, were all decided about the same time, in 1899, following the decision in the Clark Case. Two other cases, the Gault and the Gaines Cases, were decided by the United States district judges in Tennessee, and appeared to have no original force. They simply followed the others. The leading cases referred to were all attempts, by suits in equity, to enjoin the collection of illegal assessments, and to recover them back, and relief was denied on the ground that the court of a state other than the state of the insurance company could not exercise jurisdiction to inquire into the internal management and administration of a mutual life insurance company, because that was beyond its reach, and it could not make its order effective in the way of punishing or correcting either the officers of the corporation or the corporation itself, if it should find there had been a dereliction of duty.

Later than these are the cases of Strauss, Ebert, and Benjamin. Strauss v. Mutual Reserve, etc., Ass'n, 126 N. C. 971, 36 S. E. 352, 54 L. R. A. 605, 83 Am. St. Rep. 699; Ebert v. Mutual Reserve, etc., Ass'n, 81 Minn. 116, 83 N. W. 506, 834, 84 N. W. 457; and Benjamin v. Mutual Reserve, etc., Ass'n, 146 Cal. 34, 79 Pac. 517. The Strauss and Ebert Cases were suits to recover damages for the wrongful cancellation of certain policies of this company. The Benjamin Case was a suit to recover back certain illegal assessments which were made and collected. The cases were not different essentially from

that at bar. In each the court was required to construe the constitution, by-laws, and policy, the fundamental law of the association, and determine therefrom whether certain assessments were or were not valid. That is what the plaintiffs below seek, and that is what the court below held they could not secure, except in New York. Some of the courts which declined to take jurisdiction seemed alarmed at the possibility of confusion if every state in which the insurance company did business should entertain suits to construe and enforce its policies. It seems to us, however, it would be easier for the faraway litigants to have that matter handled at their homes, rather than take a trip to New York and hire a lawyer there for the same purpose. A citizen who takes a policy in Tennessee in a New York company, after the company had agreed that service of process in Tennessee might be made upon the insurance commissioner of that state, has reason to believe that he or his beneficiaries, if the company fails to treat them rightfully, will have a ready resort to the courts of Tennessee for redress. It is not necessary to take the view that, in order to construe and enforce a policy, there must be an interference with the internal management of the company. The internal management will go on as before, and there will be no interference with the constitution and by-laws or with the lawful authority of the officers of the corporation. In construing a policy it is not necessary to interfere with the proper discretion of the officers. Where there is discretion, the officers will be allowed full range; it is only where there is no discretion, and the act is clearly unauthorized and wrong, that the law will interfere. In the cases to which we have referred, one in North Carolina, one in Minnesota, and one in California, it was necessary to construe the policy in connection with what the company had done, as shown by the insurance reports of New York. But the matter was entirely simple. There was no attempt to entrench upon the rights or the authority of the officers. What they did was plain, and the law was plain, and there was no reason why the court of the state where the policy holder lived and the insurance was written and the contract made should not take jurisdiction of the suits that resulted. If all this applies to the courts of the states, much more does it apply to the courts of the United States.

The judgment is reversed, and the case remanded for further proceedings.