MINNIE E. CASE ET AL., APPELLEES, V. SUPREME TRIBE OF
BEN HUR, APPELLANT.

FILED MAY 16, 1921.   No. 20756.

1. **Insurance:** BENEFICIAL ASSOCIATIONS: INCREASE OF RATES. When
an insured in a fraternal benefit association agrees to be bound
by future changes of the by-laws, the association may make
amendments increasing the rates and changing the plan of as-
sessments for the general good of the order, so long as such
changes do not work an injustice between the individual mem-
bers, are not discriminatory, and are reasonable.

2. ———: ———: ———. In the absence of averment or proof to
the contrary, it will be presumed that an increase of rates or
change of plan of assessments to increase revenues was reason-
able as to the amount of the increase in the charges, when it ap-
pears that the amended regulation was duly enacted.

3. ———: ———: ———. Though the increase of assessments,
adopted by a fraternal association, should be so high as to make
it unprofitable and prohibitive to older members, that fact, stand-
ing alone, would not make the rate unreasonable, if the assess-
ment is no more than experience has shown is necessary to
properly meet the cost of covering such individual with insur-
ance at his attained age.

4. ———: ———: CLASSIFICATION OF MEMBERS: DISCRIMINATION.
Where such an association, by amendment of its by-laws, divides
its members into two classes, placing all members belonging to
the association prior to a certain date in one class, and all who
have joined or should join after that date in another class, and
provides that each class shall raise its own funds and pay its
own losses, and that the former class is to continue without the
aid of growth and the addition of young blood, and makes it nec-
essary, where a member of the former class should desire to
change and become a member of the latter class, that he sur-
render what rights he had in the funds of the former class and
surrender that security furnished by the mutual promises of
members of that class, *held*, that the classification is discrimina-
tory and unreasonable as against the members of the former class,
and will not be upheld.

5. ———: ———: AMENDMENT OF BY-LAWS: VALIDITY. Where a
benefit certificate provided that, in case insured should reach 70
years of age and be disabled, he should receive disability benefits,
and his policy then be considered paid up, an ₐamendment to the

by-laws, made prior to insured's reaching 70 years of age and becoming disabled, which required payment of assessments during the period of such disability, after the age of 70, impairs no vested rights under the policy, and is not to be treated as a reduction in the amount of benefits provided by the policy.

6. ———: ———: CLASSIFICATION OF MEMBERS: WAIVER. Where the insured, on the representation to him by the agent of the association that his policy was paid up and that he would not be required to make any further payments, signed a statement presented to him by . the agent, which contained in it a printed clause, agreeing that insured would pay additional assessments during such period of disability, but where no consideration moved from the association to him for such agreement, and there were no elements of estoppel shown and none pleaded, *held*, insured had not waived his right to object to the discriminatory classification of members, and was not bound by such signed statement; it being further shown that the amount he had paid to the association in the past was sufficient 'o cover all payments due, or to become due, on his policy, in accordance with the association's rules as they existed prior to the establishment of rates upon the discriminatory basis complained of.

APPEAL from the district court for Lancaster county: WILLIAM M. MORNING, JUDGE. *Affirmed.*

*Garlow & Long,* for appellant.

*Burr & Brown,* contra.

FLANSBURG, J.

This is an action on a benefit certificate issued by the Supreme Tribe of Ben Hur, a foreign fraternal beneficiary association. The defendant contends that the policy had become forfeited by default of payment of the assessments. These assessments were levied by virtue of amendments to the by-laws made after the certificate sued on was issued, and plaintiffs claim the amended by-laws were unreasonable, impairing vested rights under the benefit certificate, and were therefore not binding on insured. At the close of the testimony the court directed a verdict for the plaintiffs. Defendant appeals.

The certificate sued on contained the usual provision that the insured would be bound by all the laws, rules

and regulations of the society thereafter enacted. It was in the amount of $500, and was issued to John Case in 1901, when he was 54 years of age. Plaintiffs were named as beneficiaries.

At the time this certificate was issued the by-laws of defendant association provided for the monthly payments of $1 for insurance, the amount of the benefit being rated according to age, so that while members entering between the age of 18 and 25 received benefit certificates in the amount of $1,500 for a monthly payment of $1, members entering at 50 years of age received certificates of $500 only. All members were also required to pay a per capita tax of 75 cents semiannually, together with lodge dues, or what were called "court dues," levied by the subordinate court.

The benefit certificate in question provided that, in the event of the insured becoming physically disabled from old age after reaching 70 years and making proof of such fact, he should receive one-tenth of the face of the policy that year and a like sum each year thereafter until the whole benefit was paid or until the member should die, and it also, however, further provided "that such member shall continue to pay his or her court dues and per capita tax" though the monthly payments for insurance were not required from that time forward.

In May, 1908, the by-laws of this defendant association were amended in the manner of which plaintiffs complain, whereby all holders of benefit certificates issued prior to July 1, 1908, were put in what is called Class A, and all holders of certificates issued after that time were put in Class B. The two classes were kept distinct. Each, it was provided, should raise its own funds and pay its own losses. In case the monthly payments of Class A members, as previously fixed, should be insufficient, additional payments would be required to be paid from time to time. The rates required to be paid by the Class B members were determined by valuation upon the basis of tables of

mortality, and the rate was to be fixed according to the age attained by the member at his entrance.

It was further provided that any Class A member could, at any time up to July 1, 1910, by surrendering his certificate and paying the rates fixed by the age of such member at such time, according to the schedule of rates adopted for Class B members, become a member of Class B without being required to pass medical examination, such examination, however, to be required in case he desired a disability clause in his certificate such as appears in the certificate here involved, and, in that case, it was necessary before a transfer would be allowed that he be found to be in good health and not physically disabled at the time of the transfer. It was further provided by these amended rules that the disability benefit for members in either Class A or Class B would be allowed only upon the condition that, after such disabilities were proved and insured became entitled to the disability benefit, he would still continue, not only to pay the per capita tax and court dues as theretofore provided, but would in addition continue to pay all monthly payments and assessments required. In order to change from Class A to Class B, in other words, it was necessary for the Class A member to surrender his certificate and take a new one at a rate based upon his age at the time of the transfer, as if he were an entirely new applicant for insurance in the association, and, except in the instances as stated, he would not be required to pass a medical examination.

The insured, after these amendments were adopted, remained in Class A and made all payments called for up to September 1, 1916. On July 12, 1916, he became 70 years of age, and on September 12, 1916, he applied for the old-age disability benefit. His application was approved, and he was paid the first instalment of $50. In this application, signed by insured, which was on a printed form furnished by the company, there was a printed statement that insured agreed to continue to pay, in addition to the court dues and the per capita tax, the

monthly insurance payments and assessments during the continuation of such policy and during the period when he was entitled to the disability benefits.

It is claimed by plaintiffs that insured did not know of this statement in the application. The officer of the defendant association, whose duty it was to help make out and receive such applications, testified, and her testimony stands alone on that issue, that she read the application to him and also that she told him it was her understanding that no further payments were required from him thereafter except the per capita tax and dues, and that his policy so far as insurance payments were concerned was fully paid up.

From the time that the association allowed insured the disability benefit in September, 1916, and paid him the $50 instalment, he made no further insurance payments, as provided by the amended by-laws, nor in accordance with the statement made in the application just above referred to. The per capita tax and court dues were tendered by insured, but the defendant refused to accept these and demanded the regular monthly payments and assessments as fixed at that time, and so the matter stood from September, 1916, until the insured died in° February, 1917; the association claiming that the insured's policy had lapsed by reason of his failure to pay the regular monthly payments and assessments for insurance from and after the time of the granting of the disability benefits to him.

The questions presented are: (1) Whether the classification under the amended by-laws was unreasonable and discriminatory so as to make invalid the increased assessments levied upon the insured in this case; (2) whether the provision that insured should continue to pay insurance rates, when, by the terms of his certificate, it was to be paid up in case of disability at 70, in effect reduced the benefits and thereby destroyed vested rights under the contract; and (3) whether insured had waived his rights to refuse to pay insurance rates after reaching 70 by signing the agreement to pay such additional assessments

when he signed his application for the disability benefit.

It is the rule in this state that, when an insured agrees to be bound by future changes of the by-laws, a fraternal association may make amendments increasing the rate and changing the plan of assessments for the general good of the order, so long as such changes do not work an injustice between the individual members, are not discriminatory, and are reasonable. Insured, in the case before us, remained in the class of old members who had entered the association prior to 1908. The exact amount of increase in assessments levied against him the record does not disclose. There is no averment nor proof that the assessments made were unreasonable in amount, nor greater than sufficient to the proper operation of this division of the association as a separate entity, raising its own funds and paying its own losses. On the other hand, it does not appear that the rates fixed for the members of the new class were more than was necessary to the operation of that class, nor larger than required to properly raise funds to prepare against and pay death claims as they should accrue. The rates in this class were based upon mortality tables and in accordance with the principle that each member should pay in proportion to the hazard of his own individual risk.

The next question is, therefore, whether the creation of the two divisions of members, each operating independently of the other, did in itself work an unjust discrimination as against the insured. There is no vested right to a continuance of a plan of insurance which experience might demonstrate would result disastrously to the society or its members. *Wright v. Minnesota Mutual Life Ins. Co.,* 193 U. S. 657; *Polk v. Mutual Reserve Fund Life Ass'n,* 207 U. S. 310. It is also true that, in the absence of averment or proof to the contrary, it will be presumed that an increase of rates or change of plan of assessment to increase revenues was reasonable as to the amount of the increase in the charges, if the amended regulation was duly enacted by the association. *Supreme Council, Cath-*

*olic Knights of America, v. Fenwick,* 169 Ky. 269; *Demings v. Supreme Lodge, Knights of Pythias,* 131 N. Y. 522; *Supreme Lodge v. Bieler,* 58 Ind. App. 550. It is unnecessary, therefore, to discuss the amount of assessments in this case, since there is no proof of the financial condition of the company and no evidence tending to show that the assessments were more than were reasonably necessary to carry out the objects of the order.

Considering the Class B members as a separate division, the plan devised of requiring each member to pay a rate in conformity .to the cost of insurance based on age is a reasonable regulation as among the members in that class. And it would further, as settled by the laws of this state, have been a reasonable regulation to have required all the members of this association at the time when the amended by-laws were enacted to have commenced anew and to have paid assessments based upon mortality tables, the amount of such rate to be determined by the age attained by the respective members at the date of such change in the rule of assessment. *Funk v. Stevens,* 102 Neb. 681; *Thomas v. Knights of Maccabees of the World,* 85 Wash. 665, L. R. A. 1916A, 750; *Hollingsworth v. Supreme Council of Royal Arcanum,* 175 N. Car. 615; *Supreme Lodge, Knights of Pythias, v. Mims,* 241 U. S. 574; *Reynolds v. Supreme Council of Royal Arcanum,* 192 Mass. 150. Though the increase of the assessment provided by a fraternal association should be so high as to make it unprofitable and prohibitive to older members, that fact, standing alone, would not make the rate unreasonable, if the assessment is no more than experience has shown is necessary properly to meet the cost of covering such individual with insurance at his attained age. It may be here, and in fact in most, if not all, such fraternal companies, insurance has been furnished in the past at rates far below cost. The member has lived and had the value of his assessments in the protection given him, and, when it is found that each must pay in exact accord with the risk the company has assumed in carrying him, he can-

not complain.   As Judge Holmes said in *Supreme Lodge, Knights of Pythias, v. Mims, supra*: "It is proper to remember that for many years the plaintiff had been insured, and although by what he is not likely to regard as bad fortune his beneficiary has not profited by it, she would have if he had died.   As he happily has lived he has to bear the burdens incident to the nature of the enterprise into which he went open eyed."

But when such increase in assessments is made it must progress upon a uniform plan.   It must be remembered that the promises of this association are the mutual promises of all the members in it, individually and collectively, to one another.   Each member also has the right to see that all new members shall equally assume such mutual obligations.   The basis for rates must be just and not discriminative.   In this case all members of the order, prior to 1908, are severed from the association and become a distinct entity apart from it.   It is manifest that to thus cut off the old members, undesirable risks, into a company by themselves and make them pay their own losses and raise their own funds without the aid of growth and the addition of young blood, since no new members can under the amended by-laws be placed in this division, would result in a separate division of membership; in fact, a distinct company in itself which would have a constantly dwindling membership and a rapidly increasing assessment until the lone survivor would have to pay his own death claim.   Such classification and division of members, destroying the mutuality of the promises of the members of the association as a whole and requiring older members to be thrown out upon their resources and alone compelled to proceed without the accession of new members, which destroyed the very working power of the plan under which they were operating, has been held an effectual repudiation of the contract obligation owing them by the society, and has quite universally been held an unreasonable and unjust regulation as to them, and therefore void.   *Wilson v. Supreme Conclave, I. O. H., 174 N.*

Car. 628; *Williams v. Supreme Conclave, I. O. H.,* 172 N. Car. 787; *Strauss v. Mutual Reserve Fund Life Ass'n,* 126 N. Car. 971, 83 Am. St. Rep. 699; *Tusant v. Grand Lodge, A. O. U. W.,* 183 Ia. 489; *Parks v. Supreme Circle, Brotherhood of America,* 83 N. J. Eq. 131; *Benjamin v. Mutual Reserve Fund Life Ass'n,* 146 Cal. 34; *Ebert v. Mutual Reserve Fund Life Ass'n,* 81 Minn. 116.

In the cases just cited, the facts as to classification and assessment were in all instances very similar to, and in some identical with, the method followed in the case at bar. In the *Tusant* case, *supra,* members joining before a certain date were put in Class A, and those joining after in Class B, each operating separately as if a distinct association, raising its own funds and paying its own losses. Class A was assessed on the old plan, by increasing amount of assessment and was allowed no new members, and Class B was assessed upon an insurance risk basis as determined by the age of the member. The court in that case said: "It is sufficient to say that it is of the very essence of. mutual insurance and of the efficiency thereof that it shall grow, and that it shall continue to receive new and younger blood. * * * When these men joined the order they joined themselves to a membership, many of whom had already reached their expectancy. These plaintiffs began at once to pay death losses on such. When they paid such losses they had nothing to expect in return from those whose membership had ceased by death. Their only way of compensation was from those who should come after. They relied and had a right to rely for the security of their insurance upon the new blood which was to come."

By this reasoning it is shown how the shutting off of new members into Class A, operating under the old plan, in effect actually destroyed its working ability. Obviously, then, if this class were to be continued under the old plan, the shutting off of new members was in fact an actual destruction of their plan of operation. Defendant's answer to this is, however, that insured had the

option of joining Class B with the new members and taking insurance at his then attained age. But, in order to do that, it was necessary that he part from the class in which he then was and surrender up all rights that he had therein. He was entitled to share in the funds of this class, and was entitled to have that fund, as well as the mutual promises of all the other members of that class, as his security, and these we do not believe he could be required to release without his consent. These, by going into Class B, he would be required to lose. In Class B he would begin again upon his then attained age, losing the right to benefit or credit by reason of funds already accumulated in Class A, and losing the added security that would be given him were he still allowed protection of such fund and mutual promises. In 1908, when the amendment divided the membership and allowed a transfer from Class A. to Class B, no provision was made for any transfer of the funds. This, at that time, could only have been effected by a transfer of the entire class, and, of course, power of insured was limited to transferring his own membership only. In 1916, it is true, the by-laws were amended providing for the transfer of a *pro rata* portion of the funds of Class A to the funds of Class B, following the transfer of a member, but this amendment was enacted only a month before the insured reached the age of 70, and so short a time before his proof of disability that he, no doubt, could not have passed the necessary physical examination were he to keep alive the old-age disability clause of his contract, and, furthermore, a transfer of the *pro rata* portion of the fund was not all that plaintiff was entitled to; he was entitled to have that fund in its entirety continue for his security. As we view it, he was entitled to belong to the association as he had joined it and what it had grown to be, protected by the mutual promises of all, and not required to release any part of the funds accumulated under the previous plan of assessment.

It is unnecessary to discuss at length the cases above

cited holding the classification discriminative. In all those cases the classification and method followed was the same as in the case at bar, with this exception, that in some of those cases no right of transfer was allowed by the older members to the new class, and in the others— the cases of *Wilson, Williams, Tusant,* and *Parks*—such transfer was allowed; but in some of those cases at least the rule was stated that in the allowance of such transfer the old members were discriminated against, since they were required to rerate on their then attained ages, and hence surrender rights that they had become entitled to by their long-time membership and contributions to the society. As an abstract principle of law, under our holding in *Funk v. Stevens, supra,* and other cases cited, this last statement of principle is incorrect. But the distinction must be borne in mind that, when all members of the association are required to rerate, instead of causing a division of membership into classes, the beneficial interest of each individual member in the funds and assets of the society remains unaffected. The accumulated funds still remain as his security, and the mutual promises of all its members still afford him protection; while in the transfer of an old member from Class A to Class B he surrenders all interest and rights to security in the funds and promises of all Class A members, and in fact joins a new company as a new member.

It seems to us that in the latter case cited it was those rights, required to be surrendered up, which the courts had principally in mind when they said that to require the old members to enter the class of new members destroyed what rights those members had theretofore attained. This must have been so in the North Carolina cases. In that jurisdiction it has been held in *Hollingsworth v. Supreme Council of Royal Arcanum,* 175 N. Car. 615, following the same principle as enunciated in the holding of our court in *Funk v. Stevens,* 102 Neb. 681, that an amendment of the by-laws requiring all members to rerate according to their attained age on the basis of risk as based on mortality

tables was a reasonable and valid regulation, and the court in that case, referring to the North Carolina cases, above cited, which hold the classification in question discriminatory, said: "There is another ground of distinction between the *Strauss*, *Williams*, and *Wilson* cases and the other cases cited in them, on the one hand, and our case, on the other. In the former there was, not only a raising to a higher figure of the rates, but there also was classification and discrimination. That is, the old members were put in one class and the new members in another, and the losses (death benefits) in the old class were paid from the funds collected from that class, while the losses in the new class were paid from the funds collected from that class; but in this case it appears that all moneys collected from assessments are mingled or blended in one fund, and losses paid solely out of it. It is, therefore, a single or common fund for the payment of death benefits. In the one case there is classification and discrimination, while in the other there is neither."

It therefore appears to us that the increased and added assessments upon the certificate of insured in this case, being based upon an unjust discrimination, were illegal and unenforceable. Insured, however, paid the increased assessments until in September, 1916, when, being 70 years of age and disabled on that account, he received his first instalment of disability benefit, and he refused from that time on up to the time of his death, a few months later, to pay the insurance assessments, contending that his policy was fully paid up, and, according to its terms and the rate of assessment fixed prior to the amendment complained of, such was the fact.

Plaintiffs contend further that, since the benefit certificate itself did not provide for payment of insurance assessments after disability was proved, an amendment of the by-laws requiring payment of the assessments during such period was in effect a reduction of the benefits and impaired vested rights of insured under the policy. We think this position is untenable. The argument put forth

by plaintiff that an increase of rates reduces benefits has been adopted in some states, but not in ours. It is true that an increase in rates diminishes the marginal return on the policy in the instances here presented, and in fact in every insurance contract. Our court, however, in accord with the generally accepted rule upon that subject, holds that reasonable increases in assessments do not impair vested rights in the nature of a direct reduction of the benefit to be derived from the policy. Had the insured reached the age of 70 and his policy been matured so that his rights thereunder had become vested before the by-laws were amended, a different question would have been presented; but here, in advance of any rights becoming vested, it was determined for what period of time assessments should be made. This alone, we do not believe, would invalidate the assessments, which, it was provided, should become due after the disability rights under the contract accrued.

We come, then, to the question of whether the insured had waived his rights to attack the unwarranted increase in the amount of assessments, or the levy of the additional illegal assessments, here complained of. The payment of the increased assessments up to the time of his applying for disability benefit in September, 1916, would not prevent him from claiming subsequent assessments unlawful; there being no element of estoppel shown and none pleaded nor urged in this action upon that ground. The record is silent upon facts pertaining to that question. It is true the printed application which was signed by insured recited an agreement to pay these illegal assessments from that time forward, but the officer of the company whose duty it was to collect assessments explained to him when he signed the application that the policy was then paid up and no further assessments could be required of him. When the next following insurance payment became due, insured refused to pay it. He did not become in default as to payment of the *per capita* tax and court dues called for in his certificate.

His action in signing the statement in the face of the explanation of the company's agent and his attitude from that time on could not be construed as a waiver of his right to object to these assessments, since it was apparent to all parties that no waiver was intended.   No estoppel could be based upon this statement signed by him; the company did not change its position toward him; he had made every payment called for or due at the time this first instalment was delivered to him; neither party disputed his right to collect this $50 payment; such payment could not be made to depend upon a promise by him that he would meet future insurance assessments as they became due; the association, in other words, paid him only what the policy in terms and what the law then bound it to do.   The statement could not be considered a contract or agreement to pay a further assessment, since there was no consideration moving to insured from the company to support it.   Though it be a fact that insured signed this statement that he would pay a future unenforceable assessment, that certainly would not bind him, unless the company had been misled or changed its position in some way, or unless the insured received some consideration for the promise.   Neither of such facts appears in this case.

We therefore are of opinion that plaintiffs in this case are entitled to recover upon the policy, and that the judgment of the lower court should be affirmed.

AFFIRMED.