## LUCY C. PALMER, and Another v. MUTUAL LIFE INSURANCE COMPANY OF NEW YORK.[1]

May 16, 1913.

Nos. 18,068—(69).

**Law of the case.**

1. Under the pleadings as amended and the findings, it is *held*, that the pledge agreement is the same as the one set out in the original complaint, and the construction given it on the former appeal (Palmer v. Mutual Life Ins. Co. 114 Minn. 1) is the law of the case.

**Value of insurance policy pledged for loan — cancelation.**

2. The evidence *held* to sustain a finding that the lowest value of a paid-up life insurance policy pledged to the insurer to secure the payment of a loan, was $1,986.25; *held* also that the pledge agreement stipulating that, in case of default in the payment of the loan, the policy might be cancelled or forfeited by the pledgee for a sum more than $500 less than such value is invalid, and a cancelation attempted under such agreement is ineffective.

**Remedies of insured.**

3. When such abortive cancelation is attempted but not ratified, the insured is not limited to an action as for conversion, but has the option to proceed on the assumption that the policy is in full force and effect.

**Laches.**

4. The evidence does not present any question of laches or estoppel.

**Amendment of findings.**

5. No prejudicial error is found in the refusal of the court to amend the findings of fact and conclusion of law.

After the former appeal reported in 114 Minn. 1, 130 N. W. 250, plaintiffs were allowed to amend their complaint as stated on page 397, infra. The case was tried before Dickson, J., who made findings, among others, that the actual cash surrender value of the policy on October 30, 1905 (computed according to the American experience tables of mortality and 4 per cent interest, and allowing in addition for compensation to defendant for adverse selection, based on its own

[1] Reported in 141 N. W. 518.

experience, the maximum amount which in any case could be properly allowed as a surrender charge on account of the expense element), was not less than $1,986.25 nor more than $2,263.97; that the amount owing by the insured to defendant at the date of his death, on account of the loan, with interest at the rate of five per cent per annum, was $1,680.21; and ordered judgment in favor of plaintiffs for the sum of $5,102, less the sum of $1,680.21, being the sum of $3,124.17, with interest thereon from February 23, 1909. From an order denying defendant's motion for amended findings or a new trial, it appealed. Affirmed.

*Ambrose Tighe,* for appellant.

*H. A. Hageman* and *Butler & Mitchell,* for respondents.

HOLT, J.

In 1887, the defendant, a life insurance company, insured the life of one T. R. Palmer, then 31 years old, for $5,000; the premiums were all to be paid within 15 years; and the insured was to participate in the annual dividend distribution. The policy contained no agreement as to surrender or loan value. After all the premiums were fully paid and on July 14, 1904, Palmer borrowed of the defendant $1,445 to be repaid September 1, 1905. For security, he pledged with the defendant this policy under a contract containing this provision:

"In the event of default in the payment of said loan on the date hereinabove mentioned, the company is hereby authorized at its option, without notice, and without demand for payment, to cancel said policy, and apply the customary cash surrender consideration then allowed by the company for the surrender for cancelation of similar policies, namely, $1,445, to the payment of said loan with interest, the balance, if any, to be payable to the parties entitled thereto on demand, or the company may, at its own option, renew the said loan for one year or less period on the written request of any one of the parties of the second part hereto, and without further notice to any one of the parties of the second part."

He failed to pay the loan at maturity and thereafter the defendant advised him that on October 30, 1905, it had cancelled his policy un-

der the pledge agreement and tendered to him $29 as a balance remaining of the amount allowed by defendant on the cancelation after liquidating his debt to the company. Palmer refused to accept the check and objected to the cancelation. Nothing more was done till after Palmer's death, which took place in December, 1908, when this action was brought by the plaintiffs, as representatives of his estate, to recover the amount of the policy, less the debt of the insured to the company. The case was here on demurrer to the complaint, Palmer v. Mutual Life Ins. Co. 114 Minn. 1, 130 N. W. 250, Ann. Cas. 1912B 957, to which reference is made for a more complete statement of the alleged facts. The law of the case was also therein determined to the effect that the policy was pledged and not mortgaged to the defendant; that, if the amount agreed upon in the pledge contract as the amount for which the policy was to be cancelled in case of default in the payment of the debt was greatly disproportionate to the then true value of the policy, the contract imposed a penalty for the nonpayment of a debt and no valid cancelation could be made thereunder.

Upon the trial the court found that the policy at the time the defendant undertook to cancel it was actually worth not less than $1,986.25 nor more than $2,263.97, and held this to be so much in excess of the amount stipulated in the contract to be allowed in case of forfeiture that the contract and attempted cancelation were of no effect; that the policy was still in force; and that plaintiffs were entitled to judgment for the face value thereof, less the debt it was pledged to secure. The defendant moved for amendment of the findings and a new trial, and now appeals from the order denying the motion.

Preliminary to a consideration of the one issue which we deem decisive of the appeal, we must now dispose of the defendant's contention that the amendment of the complaint, allowed after the case was here before, now presents a contract materially different from the one considered in the former opinion of this court, so that therefore that decision is not now the law of the case. Plaintiffs were permitted to amend the complaint so as to allege that the loan or pledge contract when signed by Palmer and delivered to the defendant, had a blank space after the dollar mark where the figures 1445 now ap-

pear in that part of the contract hereinbefore set out. In its answer to the complaint as amended, the defendant admitted the contract as therein alleged, except it averred that the figures 1445 were inserted in the contract when delivered. It thus appears that the defendant insists that the contract made is the identical contract alleged in the original complaint, and we think the court's finding sustains the defendant on this issue. The court finds that when the contract was delivered to the defendant, there was not only a blank where the figures mentioned were inserted, but the date and other figures in relation to the loan were not there, and that the defendant on receipt of the contract at its New York office filled in these blanks. The plaintiffs do not question the right of the defendant so to do, and, in the face of the defendant's averment that the contract as completed contained the figures 1445, we may apply the rule of law that there was implied authority to defendant to fill in the blanks. See 2 Cyc. 159, et. seq., Bishop, Contracts (2d ed.) §§ 1173, 1174 and 1176. In the last mentioned section, the author says: "A blank in a written simple contract may be filled under any sort of express or implied authorization."

The important question, and the one in our opinion determinative of the appeal, is whether the finding that the value of the policy was not less than $1,986.25 is sustained by the evidence. If the agreement was that it could be cancelled for $512 less than its true value, or if the attempted forfeiture was for $1,474 when the actual value was at least $1,986.25, we think the amount exacted is so large that it must be held a penalty; the agreement void; and any action taken under it, or upon the same basis, wholly inefficient to cancel or forfeit the policy. As we understand the defendant, the contention is that an individual life policy has no ascertainable value, unless calculated for the longest possible duration of the life of the insured; that, while it is proper to group individuals in calculating the premiums to be paid in selling insurance to an individual, such mode is not to be applied when the policy of the individual is to be cancelled.

The findings are very lengthy and set out in full many elements that bear on the value of such a policy as the one in question. The findings requested by the defendant are still more exhaustive and evi-

dentiary, if not to say argumentative, in character; one of the proposed findings upon the nature of the reserve under a level premium policy, such as this, and its bearing on the value thereof covers ten closely printed pages in the record. No useful purpose will be served by an analysis of either the findings made or the findings proposed. The general observation may be made that many kinds of property have values which are uncertain and difficult to determine. Still, when it becomes necessary in a legal controversy to determine values of property which confessedly has no market value, the courts never hesitate to do so when convinced that sufficient available data have been furnished as a guide.

It is said the particular value of this policy cannot be ascertained definitely, unless one could have known at the time the pledge was made exactly how long Palmer would live. And in the absence of that knowledge, one must take the extreme length of human life as the standard. The value of a paid-up policy depends, of course, to a great extent on the duration of life. This duration is an unknown quantity. A like uncertainty is connected with other things which nevertheless have well recognized values. It occurs to us that when the price at which a life insurance policy is sold by a life insurance company is so well and definitely established as is now, no serious difficulty ought to be encountered in finding the value of the same policy when it is bought back by the same company. Many data in relation thereto are now by experience reduced to almost exact figures; such as the expectancy of life at a given age; the actual expenses in conducting a life insurance business; the earnings derived from the reserve; the cost to replace lapsed policies; the extent to which the liability of the insurance is adversely affected by lapses (that is, the good risks are more likely to lapse than the bad, thus making the risk of the insurer greater); the market price, you might almost say, at which any kind of life insurance policy may be bought on any insurable life, and other facts too numerous to mention. The surrender or loan value is now so frequently fixed by the policy itself, if not by statute, that it furnishes some evidence of value in a case of this kind.

Frequent sales and purchases of a commodity tend to establish

value of another commodity of the same general nature. The differences in characteristics are, of course, to be taken into consideration. In Ebert v. Mutual Reserve Fund Life Assn. 81 Minn. 116, 83 N. W. 506, 834, 84 N. W. 457, the court did not anticipate any great difficulty in determining damages for wrongful cancelation of a life insurance policy. To determine such damages, the value of the policy wrongfully cancelled must, of course, be ascertained. The matter has been before the courts in various forms, and the factors to be considered in valuing a life insurance policy have been called attention to. In People v. Security, 78 N. Y. 114, 125, 34 Am. Rep. 522, an action for damages for wrongful cancelation, the court says:

"What is the damage sustained by each of these policyholders? Clearly the value of the policy which has been destroyed. When such value has been ascertained, the true measure of damage has been arrived at. But the difficulty is to determine the value. In any given case, the precise value cannot be ascertained. If the time of death were certain and the rate of interest determined, there would be no difficulty. Then the present value of the amount to be paid at death, diminished by the amount of the present value of all the premiums to be paid would give the value. But the time of death is uncertain, and hence the present value of a running policy must always be somewhat speculative and uncertain. Yet, as in all cases of difficulty, the courts charged with the duty of ascertaining value must take the best light the nature of the case admits."

In Williams v. Metropolitan, 35 App. Div. 82, 54 N. Y. Supp. 595, the court holds that, in case of suit for damages for wrongfully lapsing a life insurance policy, the recovery should not exceed the amount of what similar insurance would cost in any equally reputable company. In Speer v. Phoenix, 36 Hun, 322, 325, this rule is found:

"When the company broke this contract and the plaintiff decided to sue for damages instead of compelling the continuance of the contract, he was entitled to recover a sum that equaled the value to him of the policy, or in other words, that would make good to him the loss he sustained by its breach. By that is not meant what the company would be willing to pay for it as the surrender value under

some rule of its own, but what it would cost the plaintiff to replace the broken contract by another of equal value to him for the same amount of insurance and at the same rate of annual premium."

The measure of damages for a refusal to give a paid-up policy is not the amount of the premium paid, but the actual value of such a policy. Phoenix v. Baker, 85 Ill. 410. That the values of any life insurance policy of whatever terms and upon whatever risk are susceptible of judicial determination also appears from the following among other authorities, some of which also are to the point that a nugatory cancelation may be treated at the option of the insured either as a conversion or as leaving the policy in full force: Lovell v. St. Louis Mutual Life Ins. Co. 111 U. S. 264, 4 Sup. Ct. 390, 28 L. ed. 423; Brooklyn v. Weck, 9 Bradw. (Ill. App.) 358; Smith v. St. Louis, 2 Tenn. Ch. 727; New York v. Curry, 115 Ky. 100, 72 S. W. 736, 61 L.R.A. 268, 103 Am. St. 297; Mutual v. Twyman, 122 Ky. 513, 92 S. W. 335, 97 S. W. 391, 121 Am. St. 471.

Does the evidence support the value found? Certainly both sides did present an abundance of facts, figures, and expert opinions for the guidance of the court. As evidence bearing on the value, the court received and considered the standard mortality and experience tables; the actual cost in the defendant and other life insurance companies of a paid-up policy on Palmer's life at the age attained by him when the cancelation was attempted (the amount in defendant company being over $3,000;) the stipulated loan and surrender values in policies of similar character; the average rate of interest obtained by defendant on its invested reserve fund; the premiums paid on this policy; the carrying charges; the amount which at four per cent compound interest would produce, at the end of Palmer's expectancy of life, the face value of the policy; the amount of the carrying or surrender charges, such as expenses to procure a policy in place of the one cancelled and the compensation for adverse selection through surrender and increased mortality cost on remaining lives; and the customary manner in use by the defendant to determine the value of policies which contain no agreement as to amount. It seems to us these elements together with the testimony and expert opinion of the actuaries and persons experienced in life insurance business fur-

121 M.—26.

nished ample basis for the court's finding as to the approximate actual value of the policy at the time of the attempted forfeiture.

In respect to Palmer's policy, the accuracy of the following figures was fairly well established. Present value of the policy October 30, 1905, as a continuing policy, $2,325.19 (that is, said sum invested at four per cent. would produce the face value of Palmer's policy at the end of his expectancy of life based on the American Experience Mortality Tables), the surrender charge on account of adverse selection according to the experience of defendant $211.44, and charge for expense element (loading, which really ought to disappear entirely when the policy is paid up) $127.50; that would leave the cash surrender value $1,986.25.

While the company used the American Experience Mortality Tables and four per cent interest in selling this insurance policy, that is, in fixing the premiums, when it comes to taking it back it proposes to use six per cent instead of four per cent, and did so in this case. That difference in interest makes a difference of $639 in the surrender value. That the defendant does a large business in loaning money secured by the pledge of policies issued by it, and that a great many borrowers have acquiesced in the customary exaction of the company in calculating surrender values upon cancelation of policies at six per cent, may be some evidence of the market value of such policies; it is however not very persuasive. When the same party is in the business of both buying and selling the same commodity, we do not appreciate his method, if the margin between the buying and selling price is more than a fair profit. A profit of $639 or even $512 appears too great in this instance. We think the testimony adduced warranted the court in finding that the fair surrender value of this policy was not less than $1,986.25.

In our former decision, it is said (p. 7): "The contention of the defendant, to the effect that, even though the policy has never been legally forfeited and cancelled, and is still the valid obligation of defendant, plaintiffs cannot recover, except by showing a payment of the loan or a tender thereof, is not sound. If the policy is still in force, plaintiffs may recover the amount thereof, less the loan, with interest." Defendant insists that it was not necessary to determine the

relief plaintiffs were entitled to in the former appeal, hence the quoted part of the opinion is obiter. And it contends that the recovery herein should be limited to the difference between the amount allowed upon the cancelation and the actual value of the policy at that time. Without stopping to consider whether the rule announced in the above quotation was necessary for a disposition of the former appeal, we deem it good law.

In the absence of an agreement, the pledgee may not, upon default, without notice appropriate the pledge. The authorization to cancel in the contract under consideration is so intimately connected with the terms upon which it is to be made that it is not permissible to reject the one and retain the other. Therefore, if the amount agreed upon as the one to be allowed in case of cancelation is such that it imposes a penalty, the whole contract fails and there is no contractual authority in defendant to cancel or appropriate the policy. If, nevertheless, it did, Palmer had three courses open: He might have ratified the cancelation; he might treat the act as a conversion and bring suit for its value; or he might proceed on the theory that the policy was still his and as such a subsisting obligation of the defendant. Palmer had the option to consider the attempt to cancel the policy abortive, if the agreement was invalid. He so did by refusing to ratify the cancelation and protesting against it. It follows that, when Palmer died, the representatives of his estate could still treat the policy as an existing obligation against the defendant for the full amount thereof, less the debt of Palmer to it. These authorities sustain this position: Day v. Connecticut, 45 Conn. 480, 29 Am. Rep. 693; Metropolitan v. McCormack, 19 Ind. App. 49, 49 N. E. 44, 65 Am. St. 392; Wright v. Manhattan Life Ins. Co. 126 Fed. 82, 61 C. C. A. 138.

The defendant suggests that if the contract be held invalid, there was still a right to resort to the pledge to enforce payment of the debt, and that cancelation would be an appropriate remedy as held in the former opinion, because of the nature of a life insurance policy. True, but there is no pretense that a cancelation was made under any form recognized as valid in law in the absence of an agreement between the parties. And even if the contract be entirely laid out of

the case, an attempted cancelation for an amount including a penalty surely can stand in no better light than a cancelation under a contract void because of the inclusion of a penalty in the same amount. No other cancelation was made than such an one as is described in the pledge contract. The defendant at all times insisted that what it did was under and in virtue of that contract. It certainly is settled law that where the pledge agreement does not provide for a forfeiture of the pledge, the pledgeor's title cannot be divested without giving him notice of the forfeiture proceeding. There is no claim that Palmer was notified that on October 30, 1905, the policy would be cancelled if the debt was not then paid. The notice that the debt would be due September 1, 1905, and that the defendant in case of default would proceed under the void contract is not sufficient. Plaintiffs were therefore within their rights when, instead of suing in conversion as they might have done, this action was brought on the theory that the policy was still in force.

The contention that either laches or estoppel could be found in this case is without force. The cancelation of this paid-up policy was at once repudiated by Palmer. If the cancelation was ineffective because made under an invalid contract, there was no occasion to bring an action to reinstate the policy. Palmer was not legally required to do anything until the defendant gave due notice of applying the pledge to the payment of the debt, he had paid all the premiums and not till his death would the policy mature. The plaintiffs, on the facts herein, are clearly not guilty of laches. The fact that the value of this cancelled policy has gone into the dividend fund in part, and been distributed is, in our opinion, not of sufficient importance to sustain a finding of estoppel.

Some minor objections are preserved by the record to the steps taken by the trial court but these, in our judgment, cannot change the result. For the purposes of this case, the exact value of the policy is unimportant since this is not a suit for conversion, and even then the finding would be sufficient to sustain a judgment based on the lowest value found; it is enough here that the finding shows that the stipulated amount in the pledge agreement includes a substantial penalty for nonpayment of the debt. The legal effect of the attempt-

ed cancelation under the invalid contract, or for the same amount as therein stated, can be none other than a nullity in this case, therefore, no further findings in that respect need be made. Nor is any finding necessary upon the face of the tender of the $29 there being no claim that it was accepted. Under the ultimate conclusion reached by the trial court on the vital issue, viz.: That the cancelation agreement was invalid and hence the policy was still in full force, there was no error in refusing to allow the proposed findings on these and other immaterial matters.

The order is affirmed.