# OHIO NISI PRIUS REPORTS

## NEW SERIES—VOLUME XVII.

---

CAUSES ARGUED AND DETERMINED IN THE SUPERIOR, COMMON PLEAS, PROBATE AND INSOLVENCY COURTS OF OHIO.

---

### ACTION FOR REINSTATEMENT OF LIFE INSURANCE POLICY.

Superior Court of Cincinnati.

BENJAMIN HAAS ET AL v. THE MUTUAL LIFE INSURANCE COMPANY OF NEW YORK.

Decided, September 1, 1914.

*Life Insurance—Loan Made on Joint Policy—Note Not Paid and Policy Surrendered—Company Could Not be Required to Retain Policy in Force Until Reserve Value Was Exhausted—Cancellation of Policy Terminated all Rights of the Insured Therein—Company Not Bound to Report Reserve Value to the Insured.*

A paid-up, non-participating joint life policy of insurance for $15,000 was pledged to the issuing company by the insured as security for the payment of a loan made to them by the company. The loan agreement provided that in the event of default in the payment of the loan at the time when it became due, the company might, without notice or demand for payment, cancel the policy, and apply to the payment of said loan the sum of $8,469, "the customary cash surrender consideration allowed by the company as the surrender value of policies issued upon like terms and conditions." The loan was not paid at maturity, but the insured consented to the surrender of the policy in the manner provided for by the contract. *Held:*

1. That since under the terms of the policy of insurance the insured were not entitled to the full reserve value of the policy they could not require the company to retain the policy in force until the amount of the loan with interest had exhausted the reserve value.
2. That if the "customary cash surrender consideration" represented the substantial value of the policy, the loan agreement was valid, and the surrender and cancellation of the policy effectually terminated the rights of the insured therein.
3. Under the facts of the case, the company was under no obligation to calculate and report to the insured the full reserve value of the policy so that the insured might determine whether it would be a profitable speculation for them to keep the policy in force.

*Robertson & Buchwalter*, for plaintiffs.
*Stephens, Lincoln & Stephens*, contra.

OPPENHEIMER, J.

On February 24th, 1886, the Mutual Life Insurance Company of New York issued its policy numbered 277,661, in the sum of $20,000, upon the joint lives of Benjamin and Adolph Haas, of this city. This policy, which is designated as a "Limited Payment Five Year Distribution Policy," reads as follows:

"No. 277661 A.

"THE MUTUAL LIFE INSURANCE COMPANY OF NEW YORK.

"Age 37-35 Years                    Amount $20,000.

"Annual Premium for 20 years only $1056.

"IN CONSIDERATION of the application for this policy which is hereby made a part of the contract, the Mutual Life Insurance Company of New York promises to pay at its Home Office in the city of New York, unto the firm of B. and A. Haas, of Cincinnati, in the county of Hamilton, state of Ohio, their successors or assigns twenty thousand dollars, upon acceptance of satisfactory proofs at its said office, of the death of *Benjamin or Adolph Haas, partners in said firm, the policy to mature upon the death of either of them,* during the continuance of this policy, upon the following conditions; and subject to the provisions, requirements and benefits stated on the back of this policy which are hereby referred to and made part hereof;

"The annual premium of ten hundred and fifty-six dollars and — cents, shall be paid in advance on the delivery of this policy, and thereafter to the company, at its home office in the city of New York on the twenty-fourth day of February in every year during the continuance of this contract, until premiums for 20 full years shall have been duly paid to said company.

"In Witness Whereof, the said the Mutual Life Insurance Company of New York has caused this policy to be signed by its president and secretary, at its office in the city of New York, the twenty-fourth day of February A. D. one thousand eight hundred and eighty-six.

" (Signed)   Richard A. McCurdy,

"W. J. Easton,                                *President.*
   *"Secretary."*

The "provisions, requirements and benefits" referred to, which appear upon the back of the policy, are as follows:

### "Provisions, Requirements and Benefits.

*"Payment of Premiums.* Each premium is due and payable at the home office of the company in the city of New York; but will be accepted elsewhere when duly made in exchange for the company's receipt, signed by the president or secretary. Notice that each and every such payment is due at the date named in the policy, is given and accepted by the delivery and acceptance of this policy, and any further notice, required by any statute, is thereby expressly waived. That part of the year's premium, if any, which is not due and is unpaid at the maturity of this contract shall be deducted from the amount of the claim. If this policy shall become void by non-payment of premium, all payments previously made shall be forfeited to the company except as hereinafter provided.

*"Dividends.* This policy is issued on the five year distribution plan. It will be credited with its distributive share of surplus apportioned at the expiration of each five years from the date of issue. Only policies in force at the end of such terms, and entitled thereto by year of issue, shall share in such distribution of the surplus, and no other distribution to such policies shall be made at any other time. All surplus so apportioned may be applied at the end of such periods to purchase additional insurance, or in payment of future premiums on this policy, if requested in writing, or may then be drawn in cash.

*"Paid-Up-Policy.* After three full annual premiums have been paid upon this policy, the company will, upon the legal surrender thereof before default in payment of any premium, or within six months thereafter, issue a non-participating policy for paid-up insurance, payable as herein provided, for the proportion of the amount of this policy which the number of full years' premiums paid bears to the total number required.

*"Surrender.* This policy may be surrendered to the company at the end of the fifth year from the date of issue, and eighty per cent. of the reserve computed by the American Table of

Mortality and four and one-half per cent. interest, and the surplus as defined above, will be paid therefor. If surrendered at the end of the second or of any subsequent five year period, the full reserve by the same standard and the surplus as defined will be paid. No cash value will be paid for a surrender at any other time or date.

"NOTICE.

"*Powers of Agents.* No agent has power on behalf of the company to make or modify this or any contract of insurance, to extend the time for paying a premium, to bind the company by making any promise, or by receiving any representation or information not contained in the application for this policy.

"*Assignments.* The company declines to notice any assignment of this policy until the original or a duplicate certified copy thereof shall be filed in the company's home office. The company will not assume any responsibility for the validity of an assignment.

"The minimum cash surrender values referred to in the above surrender clause are as follows:

80% of reserve at end of fifth year ........$1,650.00
Full reserve at end of tenth year .......... 4,676.00
Full reserve at end of fifteenth year ........ 7,986.00
Full reserve at end of twentieth year ......12,250.00
Full reserve at end of twenty-fifth year....13,530.00."

On March 20th, 1901, fifteen full annual premiums having been paid, the policy was surrendered, and a non-participating policy for paid-up insurance in the sum of $15,000 was issued, in accordance with Clause 3 of the aforementioned provisions. The following stipulation was thereupon stamped upon the face of the policy:

"PAID-UP NON-PARTICIPATING LIFE INSURANCE.

"NEW YORK, March 20th, 1901.

"This policy having lapsed, for the non-payment of the premium due the *twenty-fourth* day of *Feburuary, 1901,* the same has been since that date, and is hereby continued as and for a paid-up policy for *fifteen thousand* dollars without participation in the surplus, and without any other right or privilege, whether of surrender value or otherwise, and said sum will be payable in one sum on receipt at the home office of satisfactory proof of the death of either  one of the insured as stated.

"W. J. EASTON,

"*Secretary.*"

During all this time Benjamin and Adolph Haas were partners, engaged in business in this city under the firm name of "B. & A. Haas." In 1907 this partnership was amicably terminated, and Benjamin Haas, together with his son, succeeded to the business under the firm name of "B. Haas & Son." Adolph Haas then removed to New York and went into business with his son and son-in-law at No. 46 E. 14th street.

For the purpose of making an equitable division of all the partnership assets, at the time of the dissolution, the brothers determined to ascertain what amount could be realized in cash upon this paid-up policy. Accordingly, on or about January 23d, 1907, they went to the office of the company in New York and made inquiry of the clerk at the loan window concerning the amount of money which might be obtained upon the policy, and the rate of interest which would be charged.

It is not entirely clear what language was used at that time, whether the injury was concerning the "equity," or "reserve," or "loan value" or "cash value." But the purpose of the inquiry is perfectly manifest. The Messrs. Haas were desirous of obtaining the largest possible sum of cash to be divided between themselves as part of the available assets of the firm.

They were told that the desired information could not be given to them by the loan clerk, who would have to submit the request to the actuarial department for calculation. They departed, and on their return later in the day were informed that the largest amount of cash which might be available to them was $8,469, the loan value of the policy to March 28th, 1907. Again there is some conflict in the testimony as to the exact designation which was applied to that sum. But it is perfectly clear that this was the loan value estimated as of the next anniversary of the policy. It is also manifest that the loan value was given because it was greater than the cash surrender value at the time when the inquiry was made. The objection was then made by the Messrs. Haas that the value thus given was too low, more than $15,000 having already been paid in by them, and at their request the entire matter was again submitted to the actuarial department for re-calculation. On the following day they returned, and were again informed that the amount here-

tofore stated was the greatest available sum. They then signified · their willingness to accept it, and the following agreement, which apparently had already been prepared, was executed:

"THIS AGREEMENT made this 24 day of Jan., 1907, between THE MUTUAL LIFE INSURANCE COMPANY OF NEW YORK, party of the first part, hereinafter called the Company, and Benjamin, Adolph, B. & A. Haas, party of the second part, WITNESSETH:

"The company agrees to loan to the party of the second part the sum of eight thousand four hundred and sixty-nine and 00/100 apportioned as follows:

"To pay premiums on Policy No. —, to — day of —

"Interest at 5% (adjusted also for interest on premiums), $75.28.

"Balance by company's check, $8,393.72.    Total $8,469.00.

"The receipt of the foregoing amount as a loan is hereby acknowledged upon the pledge as hereinafter set forth of Policy No. 277661 in said company, and the said party of the second part agree to repay the said sum of $8,469 to the company at its head office, Nassau, Cedar, William and Liberty streets, in the city of New York, on the 28th day of March, 1907.

"IN CONSIDERATION of the amount of said loan the party of the second part hereby assign, transfer and set over all of their right, title and interest in and to said Policy No. 277661 issued by said company on the life of Benjamin Haas and Adolph Haas, together with any and all moneys which may be or become payable under the same, to the company as collateral security for the payment of said loan with interest, and the said party of the second part will forever warrant and defend the title of the said company to the said policy.

"In the event of default in the payment of said loan on the date when due as herein provided, or on the maturity of any extension or renewal of said loan, it is hereby mutually agreed that the company, without further notice and without further demand for payment, may cancel said policy, and apply to the payment of said loan (with interest, if any shall have accrued), the sum of $8,469 (being the customary cash surrender consideration allowed by the company as the surrender value of policies issued upon like terms and conditions) and pay the remainder · of said sum (if any), on demand, to the parties entitled thereto; the company, however, at its own option, may extend or renew from time to time said loan for one year, or less period, upon the payment of premium (if any is required) and interest in advance for such period and upon the written request of any one of the parties of the second part hereto, and without further notice to any other party of the second part.

"In case of any extension or renewal or extensions or renewals of this loan, the foregoing provision for cancellation and surrender of the said policy shall be applicable in the event of default in the payment of said loan at the maturity of any such extension or renewal, but in such case, in lieu of the above stipulated cash surrender consideration, the company will pay, as a cash surrender value at the maturity of such extension or renewal, the customary cash surrender consideration allowed by the company on other policies issued and terminated upon like terms and conditions as this policy, which amount shall not be less than the above stipulated cash value.

"IN WITNESS WHEREOF. the said parties have executed these presents the day and year first above written.

"Witness: A. E. Andrews, Notary Public, as to both and all signatures.

"BENJAMIN HAAS,

"Insured.

"Cincinnati, Ohio.

"Address.

"ADOLPH HAAS,

"Cincinnati, Ohio.

"B. & A. HAAS,

"by ADOLPH HAAS."

In accordance with this agreement the policy of insurance was hypothecated with the company, and a receipt therefor, signed by the superintendent of policy loans, was given to them.

It will be seen that the interest, calculated at the rate of 5%, was deducted to March 28th, 1907, and a check for $8,393.72 was given to the insured.

Through an oversight on the part of the company, no notice of the maturity of this loan was sent to the insured on or before March 28th, 1907, and nothing was done by the insured in reference thereto. On May 15th, 1908, the following letter was sent to Mr. Benjamin Haas:

"THE MUTUAL LIFE INSURANCE COMPANY OF NEW YORK.

"Nassau, Cedar, Liberty and William Streets.

"Policy Loan Department.    NEW YORK, May 15, 1908.

"BENJAMIN HAAS, ESQ.,

"S. E. Corner 3d & Elm St.,

"Cincinnati, Ohio.

"Dear Sir: On January 24, 1907, a loan of $8469 was made under your policy No. 277,661, said loan to mature on March 28,

1907. Through an oversight on our part we neglected ·to send you due notice of the maturity of this loan, and now beg to enclose herewith a renewal request extending the loan from March 28, 1907, to September 28, 1908.

"Will you be kind enough to sign this request and return to us with your cheque for $661.60, being the amount necessary to cover the interest to September 28, 1908.

"Yours truly,
" (Signed)   F. W. MERCER,
"Enc. M.R.—F.S.·         Sup't of Policy Loans:"

Enclosed with this letter was a loan extension request as follows:

"LOAN EXTENSION REQUEST.

"THE MUTUAL LIFE INSURANCE COMPANY OF NEW YORK.
."Loan No. 107453.                     5/15, 1908.

"The undersigned hereby requests The Mutual Life Insurance Company of New York to accept the sum of $661.60 tendered herewith, as interest, upon loan of $8,469.00 due March 28, 1907, secured by pledge of Policy No. 277661 as collateral. The undersigned also requests the said Company to extend the time for payment of the said loan from said March 28, 1907, to Sept. 28, 1908.

"The company may, at its own option and without request by the parties or notice to them, make from time to time further extensions of the time of payment of principal of said loan.

"Interest earned $.....            ...............
"Interest unearned $....   ·            Borrower.
"Computed by .... Checked by ..    ...............
                              · "Address."

The amount thus required as a payment for the extension of the loan, $661.60, was the interest on the original loan at 5%, calculated to September 28th, 1908, to which date the loan would have been extended by the company in the event of the payment of that sum.

This letter and enclosure were immediately forwarded by Mr. Benjamin Haas to his brother, Adolph Haas, and the latter, who then resided in New York, thereupon called at the office of the company to make further inquiry concerning the loan. After a conversation with one of the clerks in the policy loan

department, he determined that it would be unwise to pay the required sum for the purpose of keeping the policy and loan in force, and consented to a surrender of the policy. The words "surrender policy" were then written across the face of the letter by the company's clerk, and the policy was started through for surrender, the process being completed on May 28th, 1908. Thereupon, Mr. Adolph Haas wrote to his brother and informed him what had been done, adding that because of the company's oversight the policy had remained in force for more than one year longer than would otherwise have been the case, and that the insured were "nothing out and nothing in" by the error. Mr. Benjamin Haas then made further inquiry concerning what had taken place, and was informed that no document had been signed by the brother, the policy having been merely forfeited by the company. He was also informed that the brother had inquired about the "equity" in the policy, and was told that they had had one year's insurance to which they were not entitled.

On December 8th, 1908, Adolph Haas died, and ten days later Benjamin Haas furnished proof of death. The company, however, refused to pay the claim, whereupon this suit was instituted by Benjamin Haas and the Administrators of the Estate of Adolph Haas to set aside the surrender and require the reinstatement of the policy, and to recover the sum of $5,801.74, with interest from December 18th, 1908, being the amount of the face of the policy less the loan with interest at the rate of 5%.

Plaintiffs' claim is based upon the contention that the amount due to the insured on January 24th, 1907, was only the loan value; that at that time the actual reserve value of the policy (calculated as of March 28th, 1907, the date of the maturity of the loan) was in excess of $9,475; that the reserve value of the policy on May 28th, 1908, was in excess of $9,668, and that the reserve value of the policy at the time of Adolph Haas's death was in excess of $9,764. In other words, plaintiffs contend that the "equity" in the policy was sufficient to cover the loan with interest up to the date of Adolph Haas's death, and that therefore the company had no right to cancel the policy. We are

thus confronted with the question whether the insured .were at
the various times mentioned—particularly at the time when the
loan was made—entitled to the *reserve value* of the policy, either
as an actual advancement or as a credit in their favor for the
purpose of calculating their "interest" or "equity "

It is manifest that the policy is decidedly illiberal in its terms.
Indeed, under the laws now in force, both in the state in which
it was issued and in this state, no such policy could be written.
But it will be remembered that at the time when the policy was
issued, joint-life policies were comparatively infrequent. In-
deed, there is testimony tending to show that only one policy
of this precise character—a joint-life policy on brothers who
were also partners—had then been issued by the defendant
company, and that this policy was also held by Cincinnatians.
It is not our privilege to re-write contracts for the company' or
its patrons, and in the absence of legislation nullifying the pro-
visions of such contracts, we are compelled to interpret them
as we find them, albeit we may construe its provisions strictly
against the· company by which they were written, and in favor of
the insured.

In the first place, when the policy was originally surrendered,
and a policy for paid-up insurance was issued in its place, the
paid-up policy was by express agreement without right of par-
ticipation in the company's surplus, and "without any other
right or privilege, whether of surrender value or otherwise."
The company was under no contractual obligation to allow any
cash value or to make any loan upon the policy. And we are
concerned only with contract rights, not with "abstract moral-
ity"—whatever that may mean. Now at the time when this
policy was written it appears that the company made no loans
whatever. In 1898, in answer to popular demand, the company
started a loan department, and the privilege of making loans
was ultimately extended to all policy holders, whether the policy
expressly negatived the right to a loan or not. Accordingly
in this case the loan and surrender values were calculated and
allowed although the insured were not contractually entitled
thereto.

It is not difficult to determine what the cash surrender or the loan value of the policy may be at a given date, and it is not contended that either the cash or loan value was incorrectly stated to the insured at the time when the loan was made and when the policy was surrendered. But plaintiffs contend that the inquiry of the insured was directed toward ascertaining the full *reserve* value of the policy, and that they were entitled to know this. They allege that if the insured had been correctly advised concerning this value they would undoubtedly have continued the policy in force; and that inasmuch as the reserve value was in excess of the amount of their loan with interest, the company was bound to keep it in force until the reserve value was exhausted. Of course we may only speculate as to what the insured would have done. if other information had been given them, but for the purpose of the case we may assume that plaintiffs' contention is correct.

The only reference in the policy to any "reserve" is in the last clause of the "provisions" upon the back. It is there stated that the minimum cash surrender values shall at stated intervals, be a certain portion. of, or the full "reserve" at those times. But it is further provided that "no cash value will be paid for a surrender at any other time or date." Accordingly the insured were not, as of right, entitled to a cash value at the time when the loan was made by the company. We are threefore restricted in our inquiry to the sole question whether, on May 28, 1908, the insured were entitled to have the benefit of the full reserve value of the policy, or, to put the matter conversely, whether the company was bound to allow to the insured the full reserve value. The loan agreement described the amount to which they were entitled as "the customary cash surrender consideration allowed by the company as the surrender value of policies issued upon like terms and conditions." This language is by no means definite. It may signify different things at different times. But its meaning may be definitely ascertained at any particular time, and the testimony indicates that in the present case the "customary" surrender and loan values were accurately calculated and quoted.

Plaintiffs seek to show that their inquiry was, both at the time when the loan was made and at the time when the policy was surrendered, concerning the "reserve value" of the policy. This term is used by Mr. Benjamin Haas interchangeably with "equity." But the meaning which he attached to the expression is apparent from the purpose which the brothers had in mind when the loan was made, as well as from his testimony both at the time of trial and previously when his deposition was taken. The Messrs. Haas were dissolving their partnership and dividing their tangible assets. This policy was an asset of the partnership. The only manner in which it could be divided was by immediately realizing as much cash as possible thereon, and dividing the cash. They apparently had no desire to make a loan as such. The loan value was accepted because, as computed by the company, it was greater than the cash surrender value. And it is significant, as counsel point out, that the word "reserve" never occurs in any of plaintiff's correspondence *ante litem motam*.

But it will be helpful in the determination of the case to ascertain the significance of the expression "reserve value." Ordinarily a policy holder knows nothing about "reserves." This is by no means strange for ordinarily a policy holder has nothing to do with them. He makes no inquiry concerning them, this being usually left for those who represent his estate after his death. A policy of life insurance is a contract between two parties. Their mutual rights and obligations are determined solely by the provisions of that contract, so far as it is not in conflict with the law. Unless the contract makes the reserve value available to the insured, he is not concerned with it. Moreover a reserve value is a mere abstraction. It is defined in the Standard Dictionary (Ed. 1913, p. 2092) as "the amount *theoretically* accumulated at any given time on a company's outstanding policies, which amount must *in theory* be held to enable the company, aided by future income, to meet future obligations on these policies." [Italics ours.] In other words, it is an amount which, if capitalized at a specified rate of inter-

est, will, according to a certain basis of life expectancy, ultimately produce the face value of the policy. It is a mere guaranty of solvency designed to protect the insured against loss. It is a creature of the law. The insurer is under no contractual obligation to establish such fund, but is required to do so by statute. Nor can it properly be said that the reserve will at any specified time be a definite amount, for the rate of interest and the mortality table adopted as a basis of calculation may vary from time to time. Thus, it appears from the testimony that at the time when this policy was issued the company was required by the laws of New York to report all reserves on the basis of the American Table of Mortality, assuming 4½% interest; subsequently the law was amended so as to require the so-called Actuaries' Table, with interest calculated at 4%; after the Armstrong investigation in New York, this was again altered so as to require the use of the American Table of Mortality, assuming 3½% interest, and since January 1, 1907, the American Table of Mortality with 3% interest has been employed. It will, of course, be borne in mind that the amount of the reserve increases as the rate of interest on which the reserve is computed decreases. When this loan was made, therefore, the American Table with 3% interest was employed by the company in ascertaining reserve values on all new business, and the same table with 3½% interest on all old policies. But plaintiffs seek to require that the computation in this case be made on a 4½% basis because of the surrender provision in the policy. But we have already shown that the contingency upon which this provision was applicable had never come into existence.

Plaintiffs have assumed throughout that an inquiry concerning the "equity" in the policy obligated the defendant to advise them concerning the "reserve" value. This, however, is by no means apparent to us. Indeed, we do not think that an insurer ordinarily understands "equity" and "reserve value" to be synonymous terms. We have already defined the latter; the former is usually employed to signify the amount which may be due to the insured in paid-up insurance, extended insurance or in cash, under the contract.

Let us consider what the relative positions of the insurer and the insured would have been if, in May, 1908, Adolph Haas had paid the interest demanded by the company as a condition precedent to the further carrying of the loan. The insurance would have remained in force, less the amount of the loan, until September 28th, 1908. At that time the full reserve upon the policy, estimated according to the American Table of Mortality and $4\frac{1}{2}\%$ interest, was approximately $9,718; the amount of the loan without interest was $8,469, or approximately $1,249 less than the full reserve value upon the policy. What the insured would have determined to do on September 28th, 1908, is, of course, problematical. But it must be borne in mind that the company would then have had a perfect right under the contract to refuse to carry the loan any longer and to have required a surrender charge for the full amount allowed by law in such case. The surrender charge does not appear to be fixed in any manner. It is simply a sum required by the insurer to be paid in order to reimburse it for adverse selection, or, as defined by one of the witnesses in this case, "a repayment to the company of the damage presumably caused by the withdrawal of healthy lives," the assumption being that a man in poor health will not surrender his policy. This charge is recognized as perfectly legitimate and, as the amount thereof was in this case indefinite, the amount of the loan which the company would be willing to grant under the policy in its paid-up form was entirely optional. But it would seem that all that the company could, under the law of New York, have allowed to the insured on September 28th, 1908, would have been the difference between the full reserve, and the loan with interest, in cash or paid-up insurance.

As we have heretofore indicated, we believe that plaintiffs' position is based upon a misapprehension as to their contractual rights under the policy. The company was not compelled at any time to make the loan. It was under no obligation to fix a cash surrender value upon the policy in its paid-up form, i. e., after it had been surrendered for paid-up insurance. There was no provision for the allowance in cash of the reserve value at

any other than the various five year periods mentioned in the policy, and then only upon condition that the policy continued in force in its original form.

Plaintiffs cite the case of *Palmer* v. *Ins. Co.*, reported in 114 Minn., 1, and 121 Minn., 395, as conclusive of the case at bar. An examination of that case, however, reveals many vital differences of fact, while the law which is applied to the facts will hardly serve plaintiffs' purposes. In that case the policy had, by its very terms, become paid-up and participating. It contained no agreement as to surrender or loan value. The insured borrowed the sum of $1,445 and pledged the policy under a contract similar to that executed in the case at bar. He then failed to pay the loan at maturity, whereupon defendant *without notice to him* canceled the policy and notified him of this action. Palmer *immediately* protested, demanded a reinstatement of the policy and offered to pay the amount of the loan with interest. This offer was declined by the company, and suit was brought upon the policy after the death of the insured. The judgment of the lower court was reversed for a *misconstruction of the pleadings*. The loan agreement was sustained, and the cancellation was set aside because the value of the policy was so largely in excess of the amount due at the time of the cancellation as to indicate that the company had exacted an unreasonable penalty. The court found the cash surrender value (ascertained by deducting a surrender charge of about 10%, and an expense charge, technically known as "loading," of about 5% from the reserve value) to be $1,986.25, so that the profit upon the surrender was almost 30%. In the case at bar no such proportion is apparent. Indeed, a surrender charge of the proportion recognized as permissible in the Palmer case would not, on September 28th, 1914, have left enough even of the reserve value (assuming that the insured had any interest in the reserve) to pay the interest on the loan for another year, so that the company could not have carried it for that period if it had desired to do so.

Plaintiffs also contend that the testimony indicates that the notice of maturity of the loan was sent only to Benjamin Haas;

that there is no evidence that any notice was ever sent to Adolph Haas, and that under the law of New York a cancellation under such circumstances was improper. In the first place, however, the law to which reference has been made has no bearing on this case. It refers exclusively to premiums or interest on premium notes "required by the policy to be paid." In the second place, Adolph Haas had actual notice. The notice which had been sent to Benjamin Haas was by him forwarded to his brother who then personally visited the offices of the company, and voluntarily agreed to surrender the policy and permit its cancellation. Under such circumstances failure to furnish written notice can not possibly be relied upon.

Numerous matters have been referred to by counsel, both in their elaborate and interesting arguments and in their scholarly and comprehensive briefs; but we deem it sufficient to base our opinion solely upon the interpretation of the contract of insurance which fixed the mutual obligations and privileges of the parties. We see nothing in the case to justify the exercise of the extraordinary powers of a court of equity, and the relief prayed for is accordingly denied.